**Jamin S. Soderstrom, Bar No. 261054**
jamin@soderstromlawfirm.com
**SODERSTROM LAW PC**
**3 Park Plaza, Suite 100**
**Irvine, California 92614**
**Tel:   (949) 667-4700**
**Fax:   (949) 424-8091**

**Douglas L. Mahaffey, Bar No. 125980**
dougm@mahaffeylaw.com
**MAHAFFEY LAW GROUP, PC**
**20162 SW Birch Street, Suite 300**
**Newport Beach, California 92660**
**Tel:   (949) 833-1400**
**Fax:   (949) 263-8736**

*Counsel for Plaintiffs and the Proposed Class*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ELIZABETH HART and LE'ROY ROBERSON, individually and on behalf of all others similarly situated,** | Case No. 8:17-CV-00556_____ |
| **Plaintiffs,** | **CLASS ACTION COMPLAINT** |
| **v.** | |
| **CHARTER COMMUNICATIONS, INC. and SPECTRUM MANAGEMENT HOLDING COMPANY LLC,** | **DEMAND FOR JURY TRIAL** |
| **Defendants.** | |

**Complaint Filed: _____**
**Trial Date:        None Set**

1

Plaintiffs Elizabeth Hart (Hart) and Le'Roy Roberson (Roberson, and collectively with Hart, Plaintiffs) bring this action to seek relief for themselves and millions of other individual consumers for past and ongoing fraudulent, deceptive, and unfair business practices by Defendants Charter Communications, Inc. (Charter) and Spectrum Management Holding Company LLC, formerly known as "Time Warner Cable" (Spectrum-TWC, and collectively with Charter, Defendants).

# I.  JURISDICTION AND VENUE

1.  This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1332 (diversity jurisdiction).

2.  This Court also has jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d) and 1453, because the amount put in controversy by this class action exceeds $5,000,000, there are more than 100 proposed class members, and at least one member of the proposed class and one of the Defendants are citizens of different states (CAFA jurisdiction).

3.  This Court has jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367 because the state law claims and the federal claims are so closely related that they form part of the same case or controversy under Article III of the United States Constitution (supplemental jurisdiction).

4.  This Court has personal jurisdiction over Defendants because (a) a substantial portion of the wrongdoing alleged in this Complaint took place in California, (b) both Defendants are authorized to do business in California, have sufficient minimum contacts with California, and have intentionally availed themselves of the markets in California through the promotion, marketing, and sale of products and services in California, and (c) the exercise of jurisdiction by this Court is permissible under traditional notions of fair play and substantial justice.

5.  Venue is proper in this District under 28 U.S.C. §§ 1391(b)(1) and (2) because both Defendants have a significant presence in California and a substantial part of the events and omissions that give rise to Plaintiffs' and Class members' claims

occurred in this District. Venue is also proper under California Code of Civil Procedure section 395.5 and California Business and Professions Code section 17203.

## II.    PARTIES

### A.    Plaintiffs

6.    Plaintiff Elizabeth Hart is an individual and citizen of California. She has resided in Orange County, California at all times relevant to this lawsuit. Hart signed up and paid for Defendants' Internet services and was personally harmed by Defendants' false representations and other wrongful business practices. Hart is representative of the Class members.

7.    Plaintiff Le'Roy Roberson is an individual and citizen of California. He has resided in Los Angeles County, California at all times relevant to this lawsuit. Roberson signed up and paid for Defendants' Internet services and was personally harmed by Defendants' false representations and other wrongful business practices. Roberson is representative of the Class members.

### B.    Defendants

8.    Prior to May 18, 2016, Time Warner Cable, Inc. (TWC) provided and marketed Internet services under the "Time Warner Cable" brand to consumers in California and nationwide. On May 18, 2016, as part of a series of corporate transactions that resulted in Charter Communications, Inc. (Charter) merging with TWC and continuing to operate its business, TWC merged with and into Spectrum Management Holding Company, LLC (Spectrum Holding), a Charter subsidiary. Charter and Spectrum Holding continue to provide Internet service to consumers under the brand "Spectrum," which is in the process of replacing the brand "Time Warner Cable."

9.    Defendant Spectrum Holding is a Delaware corporation with its principal place of business at 60 Columbus Circle, 17th Floor, New York, New York 10023.

10.    Defendant Charter is a Delaware corporation with its principal place of business at 400 Atlantic Street, Stamford, Connecticut 06901. Charter is the parent company of Spectrum Holding.

11.    Charter is the second-largest residential cable provider in the country. Since its merger with TWC on May 18, 2016, Charter, together with its subsidiary Spectrum Holding, has marketed and provided Internet services to millions of consumers and businesses in California and nationwide under both the "Time Warner Cable" and "Spectrum" brand names.

## III.    BACKGROUND

12.    For years and continuing through the present day, Defendants have defrauded and misled consumers by promising to deliver Internet service at speeds and with access that they knew they could not deliver.

13.    Defendants promised that consumers could obtain high Internet speeds as advertised in Defendants' various subscription plans. Defendants knew they could not deliver on their promises, however, because they leased to many consumers older-generation modems and wireless routers that were incapable of supporting the promised Internet speeds. Defendants also failed to provide an appropriate network and infrastructure that could have enabled consumers with newer modems and wireless routers to achieve the advertised Internet speeds. Indeed, both Defendants' "WiFi" and wired Internet speeds consistently, if not always, performed far below the advertised speeds. Instead of admitting their structural inability to fulfill their promises, however, Defendants continued to advertise that their wireless Internet services supported the same speeds as wired connections that are not hampered by modem and wireless router capabilities and network limitations.

14.    Defendants' structural limitations caused consumers to be unable to achieve the "fast, reliable Internet speeds" Defendants emphasized in their advertising campaigns. These limitations also prevented Defendants from fulfilling their promises of providing Internet service at high speeds that are "fast" with "no buffering," "no slowdowns," "no lag," "without interruptions," "without downtime," and "without the wait." As a result, instead of obtaining Internet speeds capable of reliable streaming of online content provided by Netflix, Amazon, YouTube, Facebook, and other companies

that offered television, movies, or other video-based content, consumers paid for Internet service and speeds that could not consistently perform as advertised. Consumers certainly could not connect numerous devices to the Internet connection at the same time for "streaming movies, group video chats, gaming, uploading large files, checking email, shopping online, social media and more" as Defendants promised.

15.    Defendants pushed forward with their Internet advertising campaigns and promises despite knowing they could not deliver. They continued to promote and sell Internet service plans that were priced higher because of higher Internet speeds, and they incentivized sales personnel to push the higher-speed, higher-priced plans on consumers. Defendants reaped financial windfalls by selling high Internet speed services without investing in the infrastructure and related equipment necessary to deliver consistently high Internet speeds and without modifying their advertising and related statements to reflect reality.

16.    In particular, consumers who paid for an Internet service plan that promised to provide Internet speeds of at least 20 megabits per second (mbps) but were leased modems incapable of consistently achieving such speeds were knowingly overcharged by Defendants. And consumers who paid for an Internet service plan that promised to provide Internet speeds of 100 mbps (and up to 300 mbps) but were leased wireless routers incapable of consistently achieving such speeds were likewise knowingly overcharged by Defendants.

17.    Even when consumers leased at higher prices—or were given as part of their plan or purchased on their own—newer generation modems and wireless routers, they still could not consistently achieve the promised Internet speeds because Defendants failed to manage their network in a manner that delivered such results. Instead, Defendants included too many subscribers in the same service group and provided too few channels for such subscribes, thus causing an Internet "traffic jam" (particularly during peak hours) that slowed every subscriber's connection to speeds substantially

below what was promised and paid-for. Indeed, even when consumers resorted to using wired connections, their Internet speeds still fell short of the promised speeds.

18.　Defendants advertisements and related business practices during the relevant period have been, and continue to be, fraudulent, deceptive, misleading, and unfair to consumers. Defendants acted knowingly and intentionally in pursuing these wrongful business practices, and they pocketed millions of dollars of windfall profits at the expense of trusting consumers. These consumers had little chance of catching Defendants in the act; nor did they have many—if any—alternatives other than to pay for Defendants' Internet services considering the Internet Age's reliance on technology and corporate consolidation that limits the number of available Internet service providers.

19.　Hart signed up for Defendants' Internet services years ago when it was still branded as "Time Warner Cable." In 2016, Hart changed her cable and telephone services but was told her only option for Internet services continued to be "Time Warner Cable." Thus, for many years continuing through the present, Hart and her family were reliant on "Time Warner Cable"—now branded as "Spectrum"—for their Internet service needs and they paid for "WiFi" Internet speeds that were promised to be fast and reliable enough to support all of their various devices and uses.

20.　Like many consumers in California and nationwide, Hart and her family rely on the Internet for social, educational, recreational, and business purposes. They use the Internet on their computers, mobile devices, and television sets, and to interact daily with friends and family members, colleagues, employers, and businesses. When connected to the Internet, they stream and download movies, music, and video content; they browse news and social media sites; they work, shop, and play games; and they engage in innumerable other Internet-based activities.

21.　Roberson also signed up for Defendants' Internet services years ago when it was still branded as "Time Warner Cable," and he continues to pay for Internet services under the "Spectrum" brand. His Internet use is similar to that of Hart's and millions of other consumers. He paid a premium for higher speed Internet services—300 mbps,

which he understood to be the highest speed available—because of his high usage and reliance on Internet services, particularly because he frequently works from home. However, he never could reach anywhere close to the promised Internet speeds, even when he resorted to a wired connection. When Defendants' personnel came to his home to test his Internet speed on multiple occasions the speeds never registered above 130 mbps, far below what he was paying for.

22.    While practically unimaginable one or two decades ago, Plaintiffs' and many other consumers' lives cannot easily function without reliable Internet service at home, school, and work. Capitalizing on this modern necessity, Defendants make promises to provide "the fastest Internet speeds available" and "enough bandwidth for everyone in your home to be connected at the same time." These promises and other similar representations entice consumers like Plaintiffs to sign up and pay high premiums for Defendants' Internet service plans offering higher speeds "without sacrificing performance."

23.    Defendants willingly sold Plaintiffs and other consumers Internet service plans that were advertised to support their intended uses. In fact, Defendants' sales personnel are incentivized to sell higher-priced, higher-speed Internet service plans by convincing consumers that such plans will ensure they will not have issues with slow Internet speeds and connectivity. Defendants accepted Plaintiffs' and millions of other consumers' high monthly payments knowing they could not deliver on the advertised promises.

24.    Defendants knowingly failed to provide Plaintiffs and other consumers modems, wireless routers, and related equipment that was incapable of consistently achieving the Internet speeds and reliability promised. Defendants likewise knowingly failed to provide a network and infrastructure capable of supporting all of its subscribers and their promised Internet speeds. Instead of performing on their promises, and instead of investing in improved products and a better network, Defendants pocketed Plaintiffs'

and other consumers' payments and continued to make the same false and misleading advertisements in search of new subscribers.

25.    On top of their false and misleading Internet service speed advertisements and other representations, Defendants also have adopted an unlawful and unfair practice of adding new fees or other charges to consumers' bills without adequate notice and outside of the terms promised upon sign-up. In 2016, Hart signed up for a promotional "Spectrum Internet with WiFi" plan with a fixed rate of $64.99 and a $10.00 "Promotional Discount," making her plan cost a total of $54.99 per month. This amount was reflected in her February 2017 bill. However, on her March 2017 bill, Hart was automatically charged $59.99, a $5.00 increase of which she was not given adequate notice and which was improperly charged to her credit card automatically. Upon information and belief, Defendants add or increase charges like these to consumers' monthly bills regularly without proper notice to consumers, without obtaining explicit and affirmative consent to such material changes to the original terms, and without providing all necessary information in a manner that is capable of being retained by the consumer.

26.    Plaintiffs, individually and on behalf of similarly situated consumers in California and nationwide, now seek the full measure of damages, restitution, and injunctive relief necessary to remedy the harm they have suffered as a result of Defendants wrongful business practices, and to punish Defendants for their knowing and intentional misconduct.

## IV.    CLASS ACTION ALLEGATIONS

27.    Plaintiffs bring this case as a proposed nationwide class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, individually and on behalf of all members of the following Class and Subclasses. Plaintiffs reserve the right to amend the following definitions before the Court determines whether class certification is appropriate or thereafter upon leave of Court.

**Proposed Class**

All individual consumers in the United States who paid for an Internet service plan offered by Defendants at any time within the relevant time period.

**Proposed False Advertising Subclass**

All individual consumers in the United States who paid for an Internet service plan offered by Defendants in reliance on Defendants' representations regarding Internet speeds and reliability.

**Proposed Automatic Renewal Payment Subclass**

All individual consumers in the United States who paid for an Internet service plan offered by Defendants, who were enrolled in an automatic renewal payment program offered by Defendants, who had material changes made by Defendants to their terms of service, and who did not receive proper notice and thereafter provide explicit and affirmative consent to such material changes.

28.    Excluded from the proposed Class and Subclasses are Defendants and their parents, subsidiaries, affiliates, officers, directors, and current and former employees; all individuals and businesses who make a timely election to be excluded from this proceeding using the correct opt-out protocol; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels, and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

29.    **Numerosity**. The members of the proposed Class and Subclasses are so numerous that joinder is impracticable. Millions of consumers in California and throughout the United States have relied on Defendants' representations concerning Internet speed, have purchased Internet service plans during the relevant period, and therefore have been subjected to and harmed by Defendants' unlawful acts. Millions of

consumers have likewise been enrolled in Defendants' automatic renewal payment programs and had materials changes to their terms of service made without proper notice and without providing explicit and affirmative consent. The number and identity of individuals who fall within the proposed Class and Subclass definitions are easily identifiable and ascertainable based on Defendants' business records.

30.    **Commonality and Predominance**. Common questions of law or fact that will drive the resolution of this case include, but are not limited to:

a.    Whether Defendants made false, misleading, deceptive, untrue, or unfair statements in their advertisements related to Internet speeds and reliability;

b.    Whether Defendants properly disclosed to consumers that the products they were receiving or using (e.g., modems, wireless routers, and related equipment) were incapable of consistently supporting the Internet speeds being advertised and purchased;

c.    Whether Defendants properly disclosed to consumers that the network and infrastructure supporting Defendants' Internet services could not consistently provide the Internet speeds and reliability promised in Defendants' advertisements; and

d.    Whether Defendants provided proper notice of material changes to the terms of service and obtained explicit and affirmative consent to such changes before automatically charging consumers' designated payment methods (e.g., credit cards).

31.    In addition to the common questions of law and fact that will drive this case, Defendants engaged in a common course of conduct giving rise to violations of the legal rights sought to be enforced by Plaintiffs and proposed Class members. Similar or identical statutory and common law violations, business practices, and injuries are involved in this case and are applicable to Plaintiffs and most, if not all, of the proposed

Class and Subclass members. Any individual questions that may arise in this case will pale in comparison to the numerous common questions.

32. **Typicality**. Plaintiffs' claims are typical of the proposed Class and Subclass members' claims because:

    a.   Plaintiffs and proposed Class members are subject to and detrimentally relied on Defendants' uniform or substantially similar advertisements and related representations;

    b.   Plaintiffs and proposed Class members are harmed by Defendants' practice of leasing modems, wireless routers, and related equipment that could not support the Internet speeds being advertised and promised;

    c.   Plaintiffs and proposed Class members, by being unable to consistently achieve the promised Internet speeds and reliability, are prevented from obtaining the full promised value of their Internet service plans;

    d.   Plaintiffs and proposed Class members are subject to Defendants' uniform terms, policies, and disclosures; and

    e.   Plaintiffs' and proposed Class members' injuries flow from a common nucleus of operative facts, can be determined from Defendants' business records, and can be calculated in an identical or substantially similar manner.

33. Given the similar nature of Plaintiffs' and proposed Class members' claims, and given the absence of material differences in the relevant statutes and common laws on which the claims are based, a nationwide Class and various Subclasses may be easily managed by the Court and the parties.

34. **Adequacy of Representation**. Plaintiffs will fairly and adequately protect the interests of all proposed Class and Subclass members. Moreover, Plaintiffs have retained counsel experienced in complex commercial litigation and consumer class

11

actions, and Plaintiffs and their counsel intend to prosecute this action vigorously. Plaintiffs have no interests that are adverse or antagonistic to those of the Class members. Plaintiffs' claims are typical of Class members' claims, and all Class members have been similarly affected by Defendants' unlawful conduct.

35. **Ascertainability**. Defendants sell Internet service plans through their websites and by other means and have collected detailed personal and financial information associated with each transaction. Accordingly, the precise number and identity of Class and Subclass members can easily be determined by reference to Defendants' business records. As such, Class and Subclass members are easily ascertainable and can be personally notified of the pendency of this action by first class mail, email, and/or published notice calculated to reach all such members.

36. **Superiority of a Class Action**. The proposed Class and each of the proposed Subclasses should be certified pursuant to Rule 23 of the Federal Rules of Civil Procedure because:

      a.    Prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudication with respect to individual Class members that would establish incompatible standards of conduct for Defendants;

      b.    Prosecution of separate actions by individual Class members would create a risk of adjudications that would, as a practical matter, be dispositive of the interests of other Class members who are not parties to the adjudications, or would substantially impair or impede their ability to protect their interests;

      c.    Individualized litigation would increase the delay and expense to all parties and the court system from the issues raised by this action; by contrast, the class action procedure provides the benefits of adjudicating these issues in a single proceeding, economies of scale,

and comprehensive supervision by a single court, and it presents no
unusual management difficulties;

d.  Unless a class-wide injunction is issued, Defendants will continue to
commit the violations described herein, and the members of the Class
and the general public will continue to be misled and injured;

e.  Because of the relatively small size of the individual Class members'
claims, no Class member could afford to seek legal redress on an
individual basis, making the class action procedure superior to
alternative means of prosecution; and

f.  Defendants have acted and failed to act on grounds generally
applicable to Plaintiffs and Class members, thereby supporting the
imposition of uniform relief to ensure compatible standards of
conduct toward all Class members.

37.  For these reasons, this case should be certified as a nationwide class action.

V.  **CAUSES OF ACTION**

## First Cause of Action

## Violation of the Lanham Act, 15 U.S.C. § 1125

38.  All of the foregoing paragraphs are incorporated herein.

39.  Defendants have both engaged in false, misleading, deceptive, unfair, and
untrue advertising and marketing tactics that Plaintiffs and Class members have relied on
to their detriment.

40.  The specific advertisements and related statements and representations
made by Defendants and relied on by Plaintiffs and Class members include, but are not
limited to:

a.  The representations that Defendants would provide Internet service at
speeds that are "fast" with "no buffering," "no slowdowns," "no lag,"
"without interruptions," "without downtime," and "without the wait;"

b.    The representations that Defendants' Internet services would permit consumers to connect "6-8 devices at the same time" for "streaming movies, group video chats, gaming, uploading large files, checking email, shopping online, social media and more;"

c.    The representations that Defendants' Internet services would provide "more than enough speed to support all the devices in your home;"

d.    The representations that Defendants would provide "the fastest Internet speeds available" with "enough bandwidth for everyone in your home to be connected at the same time;" and

e.    The representations that Defendants' Internet service plans would enable consumers to connect multiple devices to "stream video, play online games, download music, upload photos and more . . . without sacrificing performance."

41.    Defendants made these representations willfully and intentionally, knowing they were false and/or misleading.

42.    These representations have been made by Defendants on their websites, in print advertisements, and in television advertisements, among other places. Defendants intentionally used in commerce the representations described above. These representations were representations of fact used in commercial advertising or promotion. These representations misrepresent the nature, characteristics, and qualities of the relevant Internet services. Accordingly, these representations each constitute a false and misleading advertisement under the federal Lanham Act, 15 U.S.C. § 1125(a).

43.    These representations actually deceived Plaintiffs and Class members, and they have a tendency to deceive a substantial segment of consumers nationwide. These representations are material because they influenced Plaintiffs' and Class members' sign-up and purchasing decisions. Defendants caused these representations to enter interstate commerce via the online, print, and television advertising means and methods, among others.

44.    Plaintiffs and other Class members have been or are likely to be injured as a result of these representations.

45.    Plaintiff, individually and on behalf of all Class members similarly situated, seeks an injunction and any other necessary orders or judgments that will prevent Defendants from continuing with their false and misleading representations, including but not limited to an order requiring corrective advertising and restitution. He also seeks disgorgement of Defendants' profits, an award of all damages suffered, an award of the costs of the action, treble damages, and attorneys' fees.

## Second Cause of Action

**Violation of False Advertising Law, Cal. Bus. & Prof. Code § 17500 *et seq.***

46.    All of the foregoing paragraphs are incorporated herein.

47.    Defendants have intentionally made and disseminated statements to Plaintiffs, Class members, and the general public concerning Defendants' Internet services, as well as circumstances and facts connected to such services, which are untrue and misleading, and which are known (or which by the exercise of reasonable care should be known) to be untrue or misleading. Defendants have also intentionally made or disseminated such untrue or misleading statements to Plaintiffs, Class members, and the public as part of a plan or scheme with intent not to sell those services as advertised.

48.    Defendants' statements include but are not limited to:

a.    The representations that Defendants would provide Internet service at speeds that are "fast" with "no buffering," "no slowdowns," "no lag," "without interruptions," "without downtime," and "without the wait;"

b.    The representations that Defendants' Internet services would permit consumers to connect "6-8 devices at the same time" for "streaming movies, group video chats, gaming, uploading large files, checking email, shopping online, social media and more;"

c.    The representations that Defendants' Internet services would provide "more than enough speed to support all the devices in your home;"

d. The representations that Defendants would provide "the fastest Internet speeds available" with "enough bandwidth for everyone in your home to be connected at the same time;" and

e. The representations that Defendants' Internet service plans would enable consumers to connect multiple devices to "stream video, play online games, download music, upload photos and more . . . without sacrificing performance."

49. Defendants made these representations willfully and intentionally, knowing they were false and/or misleading.

50. Each of these representations and substantially similar representations constitute false and deceptive advertisements under California's False Advertising Law, Cal. Bus. & Prof. Code § 17500 *et seq.* (FAL).

51. Plaintiffs were deceived by Defendants' statements, and there is a strong probability that Class members and members of the public were also or are likely to be deceived as well. Indeed, any reasonable consumer would be misled by Defendants' false and misleading statements.

52. Plaintiffs, individually and on behalf of all Class members, seek an injunction and any other necessary orders or judgments that will prevent Defendants from continuing with their false and deceptive advertisements; restitution that will restore the full amount of their money or property; and disgorgement of Defendants' relevant profits and proceeds. Plaintiffs also seek an award of costs and reasonable attorneys' fees.

### Third Cause of Action

### Violation of Automatic Purchase Renewals Law,

### Cal. Bus. & Prof. Code § 17600 *et seq.*

53. All of the foregoing paragraphs are incorporated herein.

54. Defendants impose "automatically renewable" monthly payment terms on Plaintiffs and other consumers who subscribe to their Internet services. Consequently, under California's Automatic Purchase Renewals Law, Defendants are required to

disclose such automatic payment terms, related cancellation terms, and any material changes to the payment terms to consumers in a clear and conspicuous manner and obtain their explicit and affirmative consent to such terms and any changes.

55.    When they sign up for an make automatic payments under Defendants' automatic purchase renewal programs, Plaintiffs and other similarly situated consumers are not:

a.    provided sufficient "automatic renewal" language in a clear and conspicuous manner using text that is larger than surrounding text, in contrasting type, font, or color, or otherwise set off from the surrounding text;

b.    expressly informed of the cancellation policy;

c.    provided proper notice of any changes to the relevant terms;

d.    asked to explicitly and affirmatively consent to the relevant terms and all material changes to such terms; or

e.    provided all of the relevant disclosures, representations, and other terms in a tangible form that they can easily store.

56.    Hart was not provided proper notice and did not explicitly and affirmatively consent to changes to her payment terms made between her February 2017 bill and her March 2017 bill, and she was not provided all relevant terms in tangible form which she could easily retain.

57.    Defendants' failure to disclose all required terms and information to Plaintiffs and Class members, and their related failure to obtain explicit and affirmative consent to all material changes to such terms, violates California's Automatic Renewal Law, Cal. Bus. & Prof. Code § 17600 *et seq.*

58.    Plaintiffs, individually and on behalf of all Class members in California, seek an order enjoining Defendants' unlawful automatic renewal payment policies and practices; actual damages; restitution of their payments; the cost of this action; reasonable attorneys' fees; and all other available relief.

## **Fourth Cause of Action**

**Violation of Consumers Legal Remedies Act, Cal. Civ. Code § 1750 *et seq.***

59.    All of the foregoing paragraphs are incorporated herein.

60.    Defendants have violated California's Consumers Legal Remedies Act, Cal. Civ. Code § 1750 *et seq.* (CLRA) in multiple ways.

61.    Defendants, through their use of the representations described above and below, have engaged in unfair and deceptive acts and practices that constitute false and misleading advertising under the CLRA.

62.    The unlawful acts and practices include but are not limited

    a.    The representations that Defendants would provide Internet service at speeds that are "fast" with "no buffering," "no slowdowns," "no lag," "without interruptions," "without downtime," and "without the wait;"

    b.    The representations that Defendants' Internet services would permit consumers to connect "6-8 devices at the same time" for "streaming movies, group video chats, gaming, uploading large files, checking email, shopping online, social media and more;"

    c.    The representations that Defendants' Internet services would provide "more than enough speed to support all the devices in your home;"

    d.    The representations that Defendants would provide "the fastest Internet speeds available" with "enough bandwidth for everyone in your home to be connected at the same time;" and

    e.    The representations that Defendants' Internet service plans would enable consumers to connect multiple devices to "stream video, play online games, download music, upload photos and more . . . without sacrificing performance."

63.    Each representation and substantially similar representations constitute false and misleading advertising, and Defendants violate the CLRA by:

a.   Representing that their Internet services have characteristics, uses, and benefits which they do not have, in violation of Section 1770(a)(5);

b.   Representing that their Internet services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another, in violation of Section 1770(a)(7);

c.   Advertising their Internet services with intent not to sell them as advertised, in violation of Section 1770(a)(9);

d.   Representing that a transaction with them confers or involves rights, remedies, or obligations which it does not have or involve, in violation of Section 1770(a)(14); and

e.   Representing that the subject of a transaction with them has been supplied in accordance with a previous representation when it has not, in violation of Section 1770(a)(16).

64.   Defendants' failure to provide proper notice and failure to obtain explicit and affirmative consent to material changes to consumers' bills in connection with automatic renewal payments constitutes an unconscionable term that is imposed upon consumers without informed consent in violation of Section 1770(a)(19).

65.   Defendants' acts and practices were knowing and intentional.

66.   Plaintiffs and all Class members relied on these advertisements and related statements to their detriment.

67.   Under Sections 1780 and 1781 of the CLRA, Plaintiff, individually and on behalf of all California Class members similarly situated, seek to an order enjoining Defendants' unlawful methods, acts, and practices; restitution of payments; and costs and reasonable attorneys' fees.

68.   Concurrently with the filing of this Complaint, Plaintiffs have filed affidavits in support of this Complaint stating facts showing that the action has been

1  commenced in a county or judicial district that constitutes a proper place for the trial of

2  this action. *See* Exhibit A; Exhibit B.

3  **Fifth Cause of Action**

4  **Violation of California's Unfair Competition Law (UCL),**

5  **Cal. Bus. & Prof. Code § 17200 *et seq.***

6  69.    All of the foregoing paragraphs are incorporated herein.

7  70.    Defendants have engaged in unlawful, unfair, and fraudulent business acts

8  and practices, and unfair, deceptive, untrue, and misleading advertising that constitute

9  false and misleading advertising under California's Unfair Competition Law, Cal. Bus.

10  & Prof. Code § 17200 *et seq.* (UCL).

11  71.    These unlawful and unfair acts, practices, and advertisements include but

12  are not limited to:

13  a.    The representations that Defendants would provide Internet service at

14  speeds that are "fast" with "no buffering," "no slowdowns," "no lag,"

15  "without interruptions," "without downtime," and "without the wait;"

16  b.    The representations that Defendants' Internet services would permit

17  consumers to connect "6-8 devices at the same time" for "streaming

18  movies, group video chats, gaming, uploading large files, checking

19  email, shopping online, social media and more;"

20  c.    The representations that Defendants' Internet services would provide

21  "more than enough speed to support all the devices in your home;"

22  d.    The representations that Defendants would provide "the fastest

23  Internet speeds available" with "enough bandwidth for everyone in

24  your home to be connected at the same time;" and

25  e.    The representations that Defendants' Internet service plans would

26  enable consumers to connect multiple devices to "stream video, play

27  online games, download music, upload photos and more . . . without

28  sacrificing performance."

72.    Each representation and substantially similar representations violates the UCL.

73.    These unlawful and unfair acts and practices further include the failure to provide proper notice of automatic renewal payment terms and all related terms and policies—including any and all material changes to such terms—the failure to obtain explicit and affirmative consent to such terms and material changes, and the failure to provide a tangible copy of such relevant terms and policies that consumers can easily retain.

74.    Defendants' acts, practices, and advertisements were knowing and intentional.

75.    Plaintiffs and Class members each relied on these statements to their detriment, each suffered actual injuries, and each lost money or property as a result. This harm includes but is not limited to being deceived into purchasing or maintaining an Internet service plan which they otherwise would not have purchased or maintained, or which they otherwise would not have purchased or maintained for the price paid.

76.    Plaintiffs, individually and on behalf of all Class members, seek an injunction and any other necessary orders or judgments that will prevent Defendants from continuing with their unlawful acts, practices, and advertisements; restitution that restores the full amount of their money or property; and disgorgement of their related profits and proceeds. Plaintiffs also seeks an award of costs and reasonable attorneys' fees.

### **Sixth Cause of Action**

#### **(Restitution and Unjust Enrichment)**

77.    All of the foregoing paragraphs are incorporated herein.

78.    Alternatively to the claims stated above, Plaintiffs and Class members are equitably entitled to recover from Defendants based on Defendants' inequitable and deceptive acts and practices that included falsely advertising their Internet services.

79.    Plaintiffs and Class members conferred specific economic benefits upon Defendants in the form of payments for Internet services that were not actually provided. Defendants knowingly accepted and retained such benefits, but they failed to provide the products and services as advertised and as required by law. Plaintiffs and Class members expected to receive the products and services as advertised and not be subjected to unlawful practices.

80.    Defendants were unjustly enriched by the benefits they received from Plaintiffs and Class members, and it would be unjust and unconscionable to permit Defendants to be so enriched and continue to be enriched in the future. Defendants should therefore be required to disgorge all amounts that they have been unjustly enriched, and Plaintiffs and Class members should recover such amounts, with interest, as restitution.

81.    Plaintiffs, individually and on behalf of all Class members similarly situated, seek an injunction and any other necessary orders or judgments that will prevent Defendants' unlawful practices; restitution that restores the full amount of their money or property; and disgorgement of Defendants' related profits and proceeds.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all proposed Class members, request the following relief against Defendants:

(1)    Certification of this action as a class action under Federal Rule of Civil Procedure 23, appointing Plaintiffs as class representatives and Soderstrom Law PC and Mahaffey Law Group, PC as class counsel;

(2)    An award of actual, consequential, and punitive damages to Plaintiffs and Class members in an amount sufficient to make them whole, compensate them for all harm, and punish and deter Defendants' wrongful conduct;

(3)    An award of restitution and/or disgorgement of profits and revenues to make Plaintiffs and Class members whole and to avoid unjust enrichment by Defendants;

(4)   An award of declaratory and injunctive relief stating that Defendants' acts and practices are unlawful and requiring corrective action as permitted by law, including but not limited to corrective advertising, correcting the disclosures related to Internet speeds, and correcting the disclosures related to automatic renewal payments and changes to service terms;

(5)   An award to Plaintiffs and Class counsel of reasonable litigation costs, expenses, and attorneys' fees under California Code of Civil Procedure section 1021.5, under the Lanham Act, under the CLRA, or under any other applicable rule or statute;

(6)   An award to Plaintiffs and Class members of pre-judgment and post-judgment interest, to the extent allowable; and

(7)   Any and all other relief as equity and justice requires.


Dated: March 28, 2017                    SODERSTROM LAW PC

                                         By: */s/ Jamin S. Soderstrom*

                                              Jamin S. Soderstrom

                                         and

                                         MAHAFFEY LAW GROUP, P.C.

                                         By: */s/ Douglas L. Mahaffey*

                                              Douglas L. Mahaffey

                                         *Counsel for Plaintiffs and the Proposed Class*

1    **JURY TRIAL DEMANDED**

2          Plaintiffs demand a trial by jury of all issues triable by jury.

3

4    Dated: March 28, 2017                    SODERSTROM LAW PC

5                                             By: */s/ Jamin S. Soderstrom*

6                                                 Jamin S. Soderstrom

7                                             and

8                                             MAHAFFEY LAW GROUP, P.C.

9                                             By: */s/ Douglas L. Mahaffey*

10                                                Douglas L. Mahaffey

11                                           *Counsel for Plaintiffs and the Proposed Class*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28