**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

JS-6

**CIVIL MINUTES – GENERAL**

Case No. SA CV 17-0556-DOC (RAOx)          Date:  November 8, 2017

Title: ELIZABETH HART ET AL V. CHARTER COMMUNICATIONS, INC. ET AL

PRESENT:

THE HONORABLE DAVID O. CARTER, JUDGE

|  Deborah Lewman  |  Not Present  |
|---|---|
| Courtroom Clerk | Court Reporter |

| ATTORNEYS PRESENT FOR PLAINTIFF: | ATTORNEYS PRESENT FOR DEFENDANT: |
|---|---|
| None Present | None Present |

**PROCEEDINGS (IN CHAMBERS):     ORDER GRANTING DEFENDANTS' MOTION TO COMPEL ARBITRATION [30]**

Before the Court is Defendants Charter Communications, Inc. and Spectrum Management Holding Company LLC's (collectively, "Defendants") Motion to Compel Arbitration and to Stay Plaintiffs' Claims ("Motion") (Dkt. 30). The Court finds this matter appropriate for resolution without oral argument. *See* Fed. R. Civ. P. 78; L.R. 7-15. Having reviewed the moving papers and considered the parties' arguments, the Court GRANTS Defendants' Motion.

**I.      Background**

**A.      Facts**

Plaintiffs Elizabeth Hart and Le'Roy Roberson (collectively, "Plaintiffs") were subscribers to the Internet services of Time Warner Cable Inc. ("TWC"). First Amended Class Action Complaint ("FAC") (Dkt. 29) ¶¶ 19, 21. In 2016, "as part of a series of corporate transactions, . . . TWC merged with and into" Defendants. *Id.* ¶ 8; *see also id.* at 2 (asserting Defendant Spectrum Holding Company LLC was "formerly known as 'Time Warner Cable'"); Declaration of Daniel J. Bollinger ("Bollinger Decl.") (Dkt. 34-1) ¶¶ 4–8 & Exs. A–B (Dkts. 34-2, 34-3).

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 17-0556-DOC (RAOx)                                Date: November 8, 2017
                                                                              Page 2

In this putative class action, Plaintiffs allege that Defendants do not provide Internet connections that are as fast as advertised because they "failed to provide a network and infrastructure capable of supporting all of its subscribers and their promised Internet speeds." FAC ¶ 24. The FAC also asserts that Defendants increased charges to consumers without adequate notice. *Id.* ¶ 25.

Defendants attest that, to receive residential Internet services, their subscribers agree to be bound by a Residential Services Subscriber Agreement ("RSSA"), which contains an arbitration provision. Declaration of Christine Flores ("Flores Decl.") (Dkt. 30-1) ¶¶ 7, 11. Defendants identify several iterations of the RSSA that they contend applied to Plaintiffs: a version operative between April 2010 and January 2014 ("2010 RSSA"), a version operative between January 2014 and April 2016 ("2014 RSSA"), and a version operative between April 2016 and June 2017 ("2016 RSSA").[1] *Id.* ¶¶ 8–9, 34; *see id.* Exs. A–B, I (Dkts. 30-2,30-3, 30-10). The first page of the 2014 RSSA notes, in a gray box with red, all-caps text offset from the rest of the text on the page, that the document "CONTAINS A BINDING 'ARBITRATION CLAUSE,' WHICH SAYS THAT YOU AND TWC AGREE TO RESOLVE CERTAIN DISPUTES THROUGH ARBITRATION . . . . YOU HAVE THE RIGHT TO OPT OUT OF THIS PART OF THE AGREEMENT." *Id.* Ex. A at 9. In pertinent part, the 2014 RSSA's arbitration provision reads:

> [E]ach of us agrees to submit [a] Dispute to the American Arbitration Association [("AAA")] for resolution under its Commercial Arbitration Rules or, by separate mutual agreement, to another arbitration institution. . . . Only claims for money damages may be submitted to arbitration; claims for injunctive orders or similar relief must be brought in a court (other than claims relating to whether arbitration is appropriate, which will be decided by an arbitrator, not a court). You may not combine a claim that is subject to arbitration under this Agreement with a claim that is not eligible for arbitration under this Agreement. . . . You may opt out of this Agreement's arbitration provision. . . . To opt out, you must notify TWC . . . within 30 days of the date that you first became subject to this arbitration provision (i.e., the date you first became subject to our Customer Agreements by signing a Work Order or using our

---

[1] Despite asserting that prior RSSAs also contained arbitration provisions, Defendants have not produced any RSSAs operative before April 2010 that may have bound Plaintiff Hart, who has been a subscriber since 2006. Flores Decl. ¶¶ 5, 11; *see* FAC ¶ 19.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. SA CV 17-0556-DOC (RAOx)                                    Date: November 8, 2017
                                                                                                  Page 3

                   Services or, if this Section 15 (or a predecessor version that is not
                   materially different from this Section 15) was not then a part of the
                   Customer Agreements, then the date that this Section 15 became
                   binding on you in accordance with the terms of Section 8(c), above).

*Id.* at 16–17.

     Section 8(c) of the 2014 RSSA states: "We will provide you at least 30 days'
notice of any material change to . . . the arbitration provisions contained in Section 15 of
this Agreement and any such change will become effective only after such notice period
has run." *Id.* at 14. Further, section 18(a) of the agreement stated that the provision
governing resolution of disputes "will survive (in other words, continue to apply to you
even after) the termination of this Agreement." *Id.* at 18.

     Plaintiffs' March and May 2014 billing statements advised that a "new TWC
subscriber agreement"—that is, the 2014 RSSA—would apply to them. Flores Decl.
¶¶ 21–26 & Exs. C–F (Dkt. 30-4 to 30-7); *see* Declaration of Elizabeth Hart ("Hart
Decl.") (Dkt. 33-14) ¶¶ 4, 6. This advisement, which appears on the same page as the
statement of amount due and payment due date, indicates that the new agreement
"contains an arbitration clause," and implores the reader to "[r]eview it &, if you wish,
'opt out' of some of the clauses at http://help.twcable.com/policies.html." Flores Decl.
¶¶ 21–23 & Exs. C–D; *see id.* ¶¶ 24–26 & Exs. E–F ("Review & 'opt out' of some of the
clauses if you wish . . . ."). These billing statements were sent via U.S. mail to both
Plaintiffs. Flores Decl. ¶¶ 21–22, 24–25; Declaration of Sara Foust-Skudler ("Foust-
Skudler Decl.") (Dkt. 34-4) ¶¶ 3–4; *see id.* ¶¶ 10–11 ("[T]hose unpaid balances
automatically caused these Billing Statements to be sent to Mr. Roberson's address of
record on his Spectrum account by U.S. Mail."); *cf.* Declaration of Le'Roy Roberson
("Roberson Decl.") (Dkt. 33-9) ¶ 4 ("I have occasionally missed the monthly email and
see an overdue balance the next month."); *but see id.* ("I have never been shown or sent
any copy of a billing statement . . . .").

     Plaintiffs did not attempt to opt out of any RSSA until March 2017, when
Defendants sent them billing statements reminding them of "terms and conditions
applicable to their services." *See* Flores Decl. ¶ 40; Roberson Decl. ¶ 6 & Exs. A–B
(Dkts. 33-10, 33-11); Hart Decl. ¶ 6 & Exs. B–C (Dkts. 33-16, 33-17). After receiving
these billing statements, both Plaintiffs, on March 15, 2017, sent letters attempting to opt
out of the 2016 RSSA. Flores Decl. ¶ 40; Roberson Decl. ¶ 6 & Ex. B; Hart Decl. ¶ 6 &
Ex. C. On June 21, 2017 and July 10, 2017, Hart and Roberson, respectively, also sent

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 17-0556-DOC (RAOx)                                        Date: November 8, 2017
                                                                                                    Page 4

letters purporting to opt out of the 2017 RSSA. Flores Decl. ¶ 41; Roberson Decl. ¶ 6 & Ex. D (Dkt. 33-13); Hart Decl. ¶ 6.

###    B.    Procedural History

Plaintiffs filed this putative class action suit on March 28, 2017 (Dkt. 1). On June 26, 2017, Plaintiffs filed the operative Complaint, the FAC, asserting six claims against Defendants: (1) violation of the Lanham Act, 15 U.S.C. § 1125; (2) violation of the California False Advertising Law, Cal. Bus. & Prof. Code § 17500 *et seq.*; (3) violation of the California Automatic Renewal Law, Cal. Bus. & Prof. Code § 17600 *et seq.*; (4) violation of the California Consumers Legal Remedies Act, Cal. Civ. Code § 1750 *et seq.*; (5) violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*; and (6) restitution and unjust enrichment. *See* FAC ¶¶ 41–84.

Defendants filed the instant Motion on July 24, 2017. Plaintiffs opposed on August 15, 2017 ("Opp'n") (Dkt. 33); Defendants replied on September 6, 2017 ("Reply") (Dkt. 34).

##    II.    Legal Standard

"[A]n agreement to arbitrate is a matter of contract." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). "[I]t is a way to resolve those disputes—but only those disputes—the parties have agreed to submit to arbitration." *Id.* (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995)). The party seeking to compel arbitration "bears 'the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence.'" *Norcia v. Samsung Telecoms. Am., LLC*, 845 F.3d 1279, 1283 (9th Cir. 2017) (quoting *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014)).

The Federal Arbitration Act ("FAA") provides that any arbitration agreement within its scope "shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2. The FAA "permits any party 'aggrieved by the alleged . . . refusal of another to arbitrate' to petition any federal district court for an order compelling arbitration in the manner provided for in the agreement." *Chiron Corp.*, 207 F.3d at 1130 (quoting 9 U.S.C. § 4). The Act "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218 (1985). When a party moves to compel arbitration, interpreting the parties' intent on

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 17-0556-DOC (RAOx)                    Date: November 8, 2017
                                                    Page 5

certain issues in the agreement remains "within the province of judicial review." *Momot v. Mastro*, 652 F.3d 982, 987 (9th Cir. 2011).

When a court is satisfied that an issue in an action is referable to arbitration, it "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3.

## III.    Discussion

Defendants argue that this action should be compelled into arbitration and that district court proceedings should be stayed, because at least one of the RSSAs binds Plaintiffs to arbitrate their claims. Mot. at 5–6. In response, Plaintiffs assert that none of the RSSAs bind them, and that, even if they are bound, Defendants cannot enforce an agreement to arbitrate with TWC. *See* Opp'n at 1–3.

### A.    The 2014 RSSA Binds Plaintiffs

Defendants proffer several theories by which they contend Plaintiffs are bound to TWC's 2016, 2014, 2010, or earlier RSSAs, which contain provisions for the arbitration of Plaintiffs' claims. Defendants claim that: (1) Plaintiffs are bound to all the RSSAs because they accepted Defendants' Internet services; (2) Plaintiffs are bound to the 2010 RSSA because they signed work orders in 2013 confirming they were bound to the 2010 agreement; (3) Plaintiffs are bound to the 2014 RSSA because they were given notice of the revised agreement in their March and May 2014 billing statements; (4) Plaintiffs are bound to the 2014 RSSA because they signed work orders in 2015 confirming they were bound to the 2014 agreement; and (5) Plaintiffs are bound to the 2016 agreement because Defendants posted the agreement on their website. *See* Motion at 5–9. Plaintiffs dispute that they agreed to any of these RSSAs, arguing that Defendants did not give them reasonable notice of the RSSAs and that Defendants did not secure Plaintiffs' knowing consent. *See* Opp'n at 10–19.

Whether Plaintiffs are bound by any of the RSSAs is a question of contract law that turns on whether the Plaintiffs entered into a legally enforceable contract with TWC. Under California law, an essential element of any contract is the mutual consent of the parties, which usually requires "an offer communicated to the offeree and an acceptance communicated to the offeror." *Donovan v. RRL Corp.*, 26 Cal. 4th 261, 271 (2001); *see also* Cal. Civ. Code §§ 1550(2), 1565. It follows that an offeree cannot accept an offer the offeree does not know exists, and a contracting party cannot unilaterally change the terms of a contract without the other's consent. *Douglas v. U.S. Dist. Court for Cent. Dist. of*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. SA CV 17-0556-DOC (RAOx)                                    Date: November 8, 2017
                                                                                                Page 6

*Cal.*, 495 F.3d 1062, 1066 (9th Cir. 2007). Indeed, "[p]arties to a contract have no
obligation to check the terms on a periodic basis to learn whether they have been changed
by the other side." *Id.* But giving notice of new terms of service—such as including a link
to a website with changed governing terms in a mailed billing statement—can be
sufficient notice to bind an offeree-consumer. *Id.* at 1066–67 (construing *Bischoff v.
DirecTV, Inc.*, 180 F. Supp. 2d 1097, 1103–06 (C.D. Cal. 2002)); *see also* Cal. Civ. Code
§ 1589 ("A voluntary acceptance of the benefit of a transaction is equivalent to a consent
to all the obligations arising from it, so far as the facts are known, or ought to be known,
to the person accepting.").

       In March and May of 2014, Defendants mailed billing statements to both Plaintiffs
that noted that there was a new agreement that contained an arbitration clause. Flores
Decl. ¶¶ 21–26 & Exs. C–F; Foust-Skudler Decl. ¶¶ 3–4. The documents stated that
Plaintiffs could opt out of the arbitration provision, and provided a link to the full text of
the relevant agreement. *See* Flores Decl. ¶¶ 21–26 & Exs. C–F. These notices were
conspicuously featured in the substantive portion of the billing statements, on the page
that containwd the charges and payment due date, with the same font size as the
substantive billing line items. *See* Flores Decl. Ex. C, at 35; *id.* Ex. D, at 41; *id.* Ex. E, at
43; *id.* Ex. F, at 45. In the May 2014 billing statements, this notice was prefaced in all
caps: "NEW TWC SUBSCRIBER AGREEMENT." *Id.* Ex. E, at 43; *id.* Ex. F, at 45.
Defendants claim that because Plaintiffs received clear notice of the new agreement and
continued to accept TWC's services, the 2014 RSSA binds Plaintiffs. Mot. at 5–6.

       In response, Plaintiffs argue that the billing statement disclosures were not
reasonably conspicuous and thus did not provide inquiry notice sufficient to bind
Plaintiffs to the 2014 RSSA. Opp'n at 15. However, in the March 2017 billing statements
sent to Plaintiffs, Defendants included notices of another new subscriber agreement
which were just as prominently displayed as the notices in the 2014 statements and did
not even include the link to the full terms of the agreement, and yet, the 2017 statements
put Plaintiffs on notice. *Compare* Roberson Decl. Ex. A, at 7 ("The terms and conditions
applicable to your services contain a binding arbitration provision . . . ."), *and* Hart Decl.
Ex. B, at 17 (same), *with* Flores Decl. Ex. C, at 35 ("You have a new TWC subscriber
agreement, which contains an arbitration clause . . . ."), *and id.* Ex. D, at 41 (same).
These 2017 notices spurred Plaintiffs to find the then-operative RSSA and try to opt out
of that arbitration provision. *See* Roberson Decl. ¶ 6 ("I learned of this 'reminder' and
figured out what 'terms and conditions' Spectrum was referring to . . . ."); Hart Decl. ¶ 6
(same). Consequently, Plaintiffs' own declarations defeat their challenge that the notice
of the 2014 RSSA was not "[r]easonably conspicuous." *Specht v. Netscape Commc'ns
Corp.*, 306 F.3d 17, 35 (2d Cir. 2002) (construing California law); *cf. Meyer v. Kalanick*,

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 17-0556-DOC (RAOx)                                 Date: November 8, 2017
                                                                                              Page 7

200 F. Supp. 3d 408, 418 (S.D.N.Y. 2016) (denying that a contract was formed under
California law because the terms of service were too obscure, noting that "the phrase
'Terms of Service & Privacy Policy' is much smaller and more obscure, both in absolute
terms and relative to the 'Register' button."), *rev'd sub nom. Meyer v. Uber Techs., Inc.*,
868 F.3d 66, 78 (2d Cir. 2017) ("[T]he design of the screen and language used render the
notice provided reasonable as a matter of California law. . . . Although the sentence is in
a small font, the dark print contrasts with the bright white background . . . .").

        Moreover, the importance of a billing statement—it contains information at the
heart of the service relationship—may make it well-suited for use a means to
communicate important information such as contract terms. In fact, a periodic billing
statement is a document with the purpose of notifying consumers of important matters
governing a service relationship, including changes from period to period in the payment
amount and due date. *Compare* Flores Decl. Ex. C, at 35 ($140.15 due March 27, 2014),
*with id.* Ex. E, at 43 ($155.00 due May 27, 2014). Thus, it may be an appropriate location
for a change of service notification. *See James v. Comcast Corp.*, No. 16-cv-02218-EMC,
2016 WL 4269898, at *2 (N.D. Cal. Aug. 15, 2016) (finding that, when a
telecommunications service provider included a new arbitration provision in a billing
statement, a consumer who continued to use the services accepted the provision); *cf.
Ackerberg v. Citicorp USA, Inc.*, 898 F. Supp. 2d 1172, 1176 (N.D. Cal. 2012)
("Numerous courts have found that continued use or failure to opt out of a card account
after the issuer provides a change in terms, including an arbitration agreement, evidences
the cardholder's acceptance of those terms.").

        Thus, if Plaintiffs received the 2014 billing statements, they would have been on
notice of the terms of the 2014 RSSA; their continued acceptance of Defendants' services
would thus bind them to those RSSA terms. Plaintiff Hart does not dispute that she
received the billing statements containing these notices. *See* Hart Decl. at ¶ 6 ("[T]hey are
the same or similar to the monthly billing statements I usually received from TWC."). On
the other hand, Plaintiff Roberson protests that because he signed up for paperless billing,
he did not receive such billing statements, and he denies receiving the March and May
2014 statements. Roberson Decl. ¶¶ 4–5. However, Defendants offer evidence that those
statements were mailed to Roberson because he had missed payments. Foust-Skudler
Decl. ¶¶ 3–4, 10–11. Roberson does not dispute missing some payments. *See* Roberson
Decl. ¶ 4. Roberson's bare denial is insufficient to show that he never received these
billing statements, especially in light of Defendants' affirmative proof of mailing, which,
under the mailbox rule, triggers the presumption that Roberson did in fact receive the
billing statements. *Schikore v. BankAmerica Supplemental Ret. Plan*, 269 F.3d 956, 963
(9th Cir. 2001) ("[T]he presumption of receipt established by the mailbox rule applied

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 17-0556-DOC (RAOx)                    Date: November 8, 2017
                                                              Page 8

precisely to avoid the type of swearing contest in which the parties are presently involved." (internal quotation marks omitted)); *see, e.g.*, *Castro v. Macy's, Inc.*, No. C 16-5991 CRB, 2017 WL 344978, at *3 (N.D. Cal. Jan. 24, 2017) (applying the common law mailbox rule to defeat a party's denial of receipt of an arbitration agreement by mail); *James*, 2016 WL 4269898, at *2 & n.5 (same); *Hill v. Anheuser-Busch InBev Worldwide, Inc.*, No. CV 14-6289 PSG (VBKx), 2014 WL 10100283, at *3 (C.D. Cal. Nov. 26, 2014) (same).

        Plaintiffs received, in their billing statements, written notice by U.S. mail of the 2014 RSSA and its arbitration provision. Thus, the Court finds that there is no factual dispute that the 2014 RSSA binds Plaintiffs. Even assuming that the 2014 RSSA did not bind Plaintiffs until 30 days after they had received notice of the new agreement, neither Plaintiff opted out of the agreement by the time the opt-out period elapsed. *See* Flores Decl. Ex. A at 14, 17; *id.* ¶ 40; Roberson Decl. ¶ 6; Hart Decl. ¶ 6. Failure to opt out after adequate notice of the arbitration provision, coupled with Plaintiffs' continued acceptance of Defendants' services, bound Plaintiffs to the arbitration provision contained in the 2014 RSSA. *See* Cal. Civ. Code § 1589 ("A voluntary acceptance of the benefit of a transaction is equivalent to a consent to all the obligations arising from it, so far as the facts are known, or ought to be known, to the person accepting.").

        Thus, the Court finds that the 2014 RSSA is a contract that binds the Plaintiffs. The Court declines to decide the existence or validity of any other contracts or arbitration provisions to which Plaintiffs purportedly agreed, including the 2010 and 2016 RSSAs.[2]

---

[2] As stated above, the Court declines to decide whether the 2016 RSSA binds Plaintiffs. Defendants assume the 2016 RSSA applies to Plaintiffs. *See* Motion at 9–13. They claim that "Spectrum made some minor updates to the [2016] RSSA in respects that are not material to this motion." *Id.* at 3. But the Court is not convinced that Plaintiffs are bound to the arbitration provision in the 2016 RSSA. The language of the 2016 RSSA's arbitration provisions is indeed nearly identical to the 2014 version. *See* Flores Decl. Ex. B, at 20, 27, 30–31. However, the 2016 RSSA substitutes the American Arbitration Association's "Commercial Arbitration Rules" with its "Consumer Arbitration Rules." *Id.* at 30. As stated in the 2014 RSSA, the agreement the 2016 version replaced, TWC was to "provide [subscribers] at least 30 days' notice of any material change to . . . the arbitration provisions contained in Section 15 of this [2014] Agreement and any such change will become effective only after such notice period has run." *Id.* Ex. A, at 14.

        Defendants have offered no evidence that it gave notice of this change to the arbitration provision in 2016. *See* Motion at 3; *cf. Douglas*, 495 F.3d at 1066 ("Parties to a contract have no obligation to check the terms on a periodic basis to learn whether they have been changed by the other side."). Though Defendants seem to contend the change is immaterial, *see* Motion at 3, the Court cannot decide based on the limited briefing on this issue that the change in the applicable arbitration rules is indeed immaterial. *See* Flores Decl. Ex. A, at 17 ("To opt out, you must notify TWC . . . within 30 days of the date that you first became subject to this arbitration provision (i.e., . . . if this Section 15 (or a *predecessor version that is not materially different from this Section 15*) was not then a part of the Customer Agreements, then the date that this Section 15 became binding on you . . . ." (emphasis added)). Plaintiffs were apparently first given notice in their March 2017 billing statements of an RSSA purportedly operative beginning in April 2016, and Plaintiffs opted out fewer than 30 days after Defendants gave notice of the changed

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 17-0556-DOC (RAOx)                                   Date: November 8, 2017
                                                                                                            Page 9

### B.       Enforceability of the 2014 RSSA

Plaintiffs argue that, if an RSSA binds them, it binds them with respect to TWC, the original party to the pre-2017 RSSAs, and thus Defendants cannot enforce the RSSAs between Plaintiffs and TWC. Opp'n at 9–10. Defendants argue that Plaintiffs have admitted that TWC and Defendants are one and the same and that, by operation of law, Defendant Spectrum Holding has the right to enforce TWC's RSSAs. Reply at 12–15.

First, Plaintiffs' FAC admits that "there is sufficient identity of parties" between TWC and Defendants. *See Valley Casework, Inc. v. Comfort Constr., Inc.*, 76 Cal. App. 4th 1013, 1021 (1999). They allege in the FAC that "TWC merged with and into" Defendants, and that Spectrum is "formerly known as 'Time Warner Cable.'" FAC at 2, ¶ 8. At least part of Plaintiffs' claims against Defendants arise from TWC's pre-merger acts or omissions. *See id.* ¶ 12 ("*For years* and continuing through the present day, Defendants have defrauded and misled consumers" (emphasis added)); *id.* ¶¶ 19, 21 ("[Plaintiffs] signed up for Defendants' Internet services *years ago* when it was still branded as 'Time Warner Cable.'" (emphasis added)). These factual assertions bind Plaintiffs to an admission that Defendants are the successors in interest to TWC. *See Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 470 n.6 (citing *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988)) (binding a party to a concession in its pleadings); *In re Barker*, 839 F.3d 1189, 1195 (9th Cir. 2016) ("Judicial admissions are 'conclusively binding on the party who made them.'" (quoting *Am. Title. Ins. Co.*, 861 F.2d at 226)).

Second, by operation of the law of Delaware, where Defendants are—and TWC was—incorporated, the merger had the effect of endowing Defendant Spectrum Holding with TWC's rights. Because Spectrum Holding is the surviving corporation in the merger, it retains "all property, rights, privileges, powers and franchises, and all and every other interest." 8 Del. C. § 259(a); *see* Bollinger Decl. ¶¶ 4–8 & Exs. A–B. Moreover, "[t]he Ninth Circuit has confirmed that non-signatories may enforce arbitration agreements . . . [w]hen the charges against a parent company and its subsidiary are based on the same facts and are inherently inseparable . . . ." *McLeod v.*

---

arbitration provision. Flores Decl. ¶ 9; Roberson Decl. ¶ 6; Hart Decl. ¶ 6; *see* Motion at 3–4; Flores Decl. Ex. A., at 14; Roberson Decl. ¶ 6 & Exs. A–B; Hart Decl. ¶ 6 & Exs. B–C. Thus, if the change in the applicable arbitration rules was material, Plaintiffs may have opted out of the 2016 RSSA's arbitration provision successfully.

       Nonetheless, given the Court's findings with respect to the 2014 RSSA, the Court cannot decide whether the arbitration provision in the 2016 RSSA binds Plaintiffs. That is, even if Plaintiffs' 2017 attempts to opt out of the 2016 and 2017 RSSAs' arbitration provisions were successful, the existence and validity of the 2014 RSSA, which contains an arbitrability delegation clause (discussed below), requires this Court to refrain from deciding the gateway arbitrability issues presented by the purported opt outs.

*Ford Motor Co.*, No. EDCV 04-1255-VAP(SGLx), 2005 WL 3763354, at *4 (C.D. Cal. Apr. 14, 2005) (quoting *J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315, 320–21 (4th Cir. 1988)). Thus, given the identity of TWC and Spectrum Holding, claims against Charter, Spectrum Holding's parent company, also may be referred to arbitration. *See, e.g.*, *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1129 (9th Cir. 2013) (noting that a signatory may be equitably estopped from avoiding arbitration "when the signatory alleges substantially interdependent and concerted misconduct by the nonsignatory and another signatory and the allegations of interdependent misconduct [are] founded in or intimately connected with the obligations of the underlying agreement" (quoting *Goldman v. KPMG, LLP*, 173 Cal. App. 4th 209, 219 (2009))).

Because Plaintiffs have admitted the identity of parties and because Spectrum Holding is endowed with TWC's rights by operation of law, Defendants can enforce the 2014 RSSA.

## C.    Delegation of Arbitrability Issues to the Arbitrator

Defendants contend that the parties agreed that questions of arbitrability of claims were clearly and unmistakably delegated to an arbitrator. Mot. at 11–13. In response, Plaintiffs argue that the incorporation of the AAA rules is qualified by a clause allowing the parties to stipulate to an alternative and that the words "claims" and "appropriate" as used in the arbitrability delegation provision are ambiguous. Opp'n at 19–21.

A party seeking to compel arbitration under the FAA has the burden to show that (1) there exists a valid, written agreement to arbitrate in a contract, and (2) the agreement to arbitrate encompasses the dispute at issue. *Cox v. Ocean View Hotel Corp.*, 533 F.3d 1114, 1119 (9th Cir. 2008); *see also* 9 U.S.C. § 2. "Although [these] gateway issues of arbitrability presumptively are reserved for the court, the parties may agree to delegate them to the arbitrator." *Momot*, 652 F.3d at 987. "[W]hether the court or the arbitrator decides arbitrability is an issue for judicial determination unless the parties *clearly and unmistakably provide otherwise*." *Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1208 (9th Cir. 2016) (quotation marks omitted) (quoting *Oracle Am., Inc. v. Myriad Group A.G.*, 724 F.3d 1069, 1072 (9th Cir. 2013)).

In the Ninth Circuit, "incorporation of the AAA rules constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability."[3] *Brennan*

---

[3] Section R-7 of the AAA's Commercial Arbitration Rules provides, "The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or the arbitrability of any claim or counterclaim. . . . The arbitrator shall have the power to

*v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015). "[T]he holding of *Opus Bank* applies . . . to non-sophisticated parties." *McLellan v. Fitbit, Inc.*, No. 3:16-cv-00036-JD, 2017 WL 4551484, at *2 (N.D. Cal. Oct. 11, 2017) (quoting *Miller v. Time Warner Cable Inc.*, No. 8:16-cv-00329-CAS (ASx), 2016 WL 7471302, at *5 (C.D. Cal. Dec. 27, 2016)); *see Zenelaj v. Handybook Inc.*, 82 F. Supp. 3d 968, 973 (N.D. Cal. 2015) (prior to *Opus Bank*, collecting cases that "found effective delegation of arbitrability regardless of the sophistication of the parties"); *cf. Mohamed*, 848 F.3d at 1208–09 (upholding an express delegation of arbitrability without considering the parties' level of sophistication).

        Here, the 2014 RSSA incorporates the AAA's Commercial Arbitration Rules in its arbitration provision. Flores Decl. Ex. A, at 16. Plaintiffs argue that the clause allowing parties to stipulate to a different arbitration institution is a qualification of this agreement to the AAA's rules. Opp'n at 20. However, providing parties the option to stipulate to a different arbitration institution is inapposite to the unequivocal agreement to use the AAA's Commercial Arbitration Rules in the absence of such an agreement. The sentence agreeing to AAA rules is supplemented, not qualified, by the clause allowing the parties to stipulate to an alternative, and the agreement is no less clear for its inclusion. *See* Flores Decl. Ex. A, at 16.

        Moreover, the 2014 RSSA expressly dictates that "claims relating to whether arbitration is appropriate . . . will be decided by an arbitrator, not a court." Flores Decl. Ex. A, at 16. Plaintiffs argue that the words "claims" and "appropriate" as used in this clause are ambiguous. Opp'n at 20.  However, though the wording of the clause is awkward, its unambiguous meaning is not lost, especially when considered in conjunction with the AAA's relegation of jurisdictional authority to the arbitrator. The parties are bound by their explicit agreement to refer questions of "whether arbitration is appropriate" to an arbitrator. *See Miller*, 2016 WL 7471302, at *5 (holding that a similar express agreement delegated arbitrability).

        This order does not preclude Plaintiffs from arguing before the arbitrator that their claims are outside the scope of their agreement to arbitrate. Indeed, some portion of the claims might not be subject to arbitration given Plaintiffs' attempts to opt out of the 2016

---

determine the existence or validity of a contract of which an arbitration clause forms a part." Am. Arbitration Ass'n, *Commercial Arbitration Rules and Mediation Procedures* 13 (2016), https://www.adr.org/sites/default/files/Commercial%20Rules.pdf; *accord* Am. Arbitration Ass'n, *Consumer Arbitration Rules* 17 (2016), https://www.adr.org/sites/default/files/Consumer%20Rules.pdf (same).

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 17-0556-DOC (RAOx)                     Date: November 8, 2017
                                                                                   Page 12

and 2017 RSSAs in March, June, and July of 2017. Nevertheless, the 2014 RSSA evinces an agreement to submit issues of arbitrability to an arbitrator.[4]

### D.    Enforceability of the Agreement to Delegate Arbitrability

Defendants emphasize that Plaintiffs challenge that the arbitration agreement generally—not the delegation provision specifically—is unenforceable. Opp'n at 21–22. Defendants charge that Plaintiffs' arguments are inapposite to the issue before this Court, that is, "whether the particular agreement to *delegate* arbitrability" is unenforceable. *Opus Bank*, 796 F.3d at 1132–33 (citing *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 71–75 (2010)); *see* Reply at 17. In *Opus Bank*, the Ninth Circuit recognized that an arbitration clause and a delegation provision within the arbitration clause "are separate agreements to arbitrate different issues" and that in such a scenario, "multiple severable arbitration agreements exist." *Id.* at 1133.

Plaintiffs' arguments that the arbitration agreement is unenforceable are properly left to the arbitrator to decide, per the express agreement of the parties. Because Plaintiffs' challenges with respect to unconscionability and waiver "failed to 'make any arguments specific to the delegation provision,'" this Court does not consider them. *Id.* at 1133 (quoting *Rent-A-Center*, 561 U.S. at 74); *see* Opp'n at 21–23; *accord McLellan*, 2017 WL 4551484, at *1 ("Challenges [to the validity of a delegation clause] may be considered by courts, but challenges [to the validity of the agreement to arbitrate] must go to the arbitrator pursuant to the delegation clause.").

## IV.    Disposition

For the foregoing reasons, the Court GRANTS Defendants' Motion.

As noted above, the arbitrator may determine that Plaintiffs' claims are not subject to the agreement to arbitrate or that the agreement is unenforceable. Thus, dismissal of Plaintiffs' claims is inappropriate.

Accordingly, the case is STAYED pending the completion of arbitration proceedings, pursuant to 9 U.S.C. § 3. The parties are ORDERED to file a status update

---

[4] This necessarily includes issues of arbitrability relating to Plaintiffs' claims for restitution and declaratory relief. "[C]laims for injunctive orders or similar relief" are carved out of the 2014 RSSA's arbitration provision. Flores Decl. Ex. A, at 16. Nevertheless, the arbitrability delegation clause divests the Court of its power to determine whether those claims are arbitrable. *See Oracle Am.*, 724 F.3d at 1076 ("[W]hen a tribunal decides that a claim falls within the scope of a carve-out provision, it necessarily decides arbitrability.").

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 17-0556-DOC (RAOx)                    Date: November 8, 2017
                                                                        Page 13

on arbitration proceedings every six months from the date of this order until the
conclusion of arbitration in this matter.

      The Clerk shall serve this minute order on the parties.

MINUTES FORM 11                                        Initials of Deputy Clerk: djl
CIVIL-GEN