1  Jamin S. Soderstrom, Bar No. 261054
   jamin@soderstromlawfirm.com
2  SODERSTROM LAW PC
   3 Park Plaza, Suite 100
3  Irvine, California 92614
   Tel: (949) 667-4700; Fax: (949) 424-8091
4
   Douglas L. Mahaffey, Bar No. 125980
5  dougm@mahhaffeylaw.com
   MAHAFFEY LAW GROUP, PC
6  20162 SW Birch Street, Suite 300
   Newport Beach, California 92660
7  Tel: (949) 833-1400; Fax: (949) 263-8736

8  *Counsel for Plaintiffs and the Proposed Class*

9  LATHAM & WATKINS LLP
       Daniel Scott Schecter (Bar No. 171472)
10        daniel.schecter@lw.com
   10250 Constellation Boulevard, Suite 1100
11 Los Angeles, CA. 90067
   Tel.: 424.653.5500; Fax: 424.653.5501
12
   LATHAM & WATKINS LLP
13    Matthew A. Brill (admitted pro *hac vice*)
        matthew.brill@lw.com
14    Andrew D. Prins (admitted pro *hac vice*)
        andrew.prins@lw.com
15 555 Eleventh Street, NW
   Washington, D.C. 20004
16 Tel.: 202.637.2200; Fax.: 202.637.2201

17 *Attorneys for Defendants*

18              UNITED STATES DISTRICT COURT

19            CENTRAL DISTRICT OF CALIFORNIA

20 ELIZABETH HART and LE'ROY          Case No.  8:17-cv-00556-DOC-RAO
21 ROBERSON, individually and on behalf of
   all others similarly situated,
22                                     **ORDER GRANTING JOINT**
                Plaintiffs,            **STIPULATION AND MOTION TO**
23                                     **CONFIRM FINAL AWARD AND**
   v.                                  **ENTERING JUDGMENT [55]**
24
   CHARTER COMMUNICATIONS, INC.
25 and SPECTRUM MANAGEMENT            Court Arbitration Order:  Nov. 8, 2017
   HOLDING COMPANY LLC,              Final Arbitration Award: March 29, 2019
26
                Defendants.
27

28

                                    1

Plaintiff Elizabeth Hart[1] ("Hart") and Defendants Charter Communications, Inc. and Spectrum Management Holding Company, LLC ("Defendants") have jointly submitted a Notice of Final Award of Arbitrator and Joint Stipulation and Motion to Confirm Final Award and Enter Judgment which provides as follows:

WHEREAS, on March 28, 2017, Hart filed an original class action complaint in this Court against Defendants, Dkt. 1, and on June 26, 2017 she filed a First Amended Complaint against Defendants. Dkt. 29.

WHEREAS, on July 24, 2017, Defendants filed a Motion to Compel Arbitration and to Stay Claims, Dkt. 30, and Hart opposed Defendants' motion, Dkt. 33; *see also* Dkt. 34 (Defendants' Reply); Dkt. 35 (Hart's Motion for Leave to File Surreply); Dkt. 36 (Defendants' Opposition to Motion for Leave); Dkt. 38 (Order Denying Motion for Leave).

WHEREAS, on November 8, 2017, the Court granted Defendants' Motion to Compel Arbitration and to Stay Claims, Dkt. 39, and made the following findings:

a.  Hart received in two 2014 billing statements written notice by U.S. mail of the Time Warner Cable Inc. ("TWC") 2014 Residential Services Subscriber Agreement ("RSSA") and disclosures in the billing statements were "reasonably conspicuous." *Id.* at 6-8.

b.  "[T]he 2014 RSSA is a contract that binds [Hart]" but it "decline[d] to decide the existence or validity of any other contracts or arbitration provisions to which [Hart] purportedly agreed, including the 2010 and 2016 RSSAs." *Id.* at 8.

c.  "[T]he existence and validity of the 2014 RSSA, which contains an arbitrability delegation clause (discussed below), requires this Court to refrain from deciding the gateway arbitrability issues presented by the purported opt outs [of the 2016 and 2017 RSSAs]." *Id.* at 8-9 n.2.

---

[1] Hart's co-plaintiff Le'Roy Roberson's claims are currently stayed and were not part of the arbitration filed by Hart.

d.  Hart admitted in the First Amended Complaint that "there is sufficient identity of parties" between TWC and Defendants and her factual assertions in the First Amended Complaint bind her to an admission that Defendants are the successors in interest to TWC. *Id.* at 9.

e.  "[B]y operation of the law of Delaware, where Defendants are—and TWC was—incorporated, the merger had the effect of endowing Defendant Spectrum Holding with TWC's rights" under the 2014 RSSA and, given the identity of TWC and Spectrum Holding, Hart's claims against Charter, Spectrum Holding's parent company, also may be referred to arbitration. *Id.*

f.  The 2014 RSSA's incorporation by reference of the AAA's Commercial Arbitration Rules in its arbitration provision constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability, and that the wording of the phrase "whether arbitration is appropriate . . . will be decided by an arbitrator, not a court" represents an "explicit agreement to refer questions of whether arbitration is appropriate to an arbitrator. *Id.* at 11.

g.  The 2014 RSSA "evinces an agreement to submit issues of arbitrability to an arbitrator." *Id.* at 12.

WHEREAS, the Court stayed Hart's claims filed in court pending the completion of arbitration proceedings. *Id.* at 12.

WHEREAS, on January 25, 2018, Hart filed a Demand for Arbitration against Defendants.

WHEREAS, on March 22, 2018, Hart filed a First Amended Demand for Arbitration and Request for Dismissal of Arbitration Based on (1) the Fact that the Arbitration Clause is "Null and Void" by Its Own Terms, and, Alternatively (2) the Inarbitrability of Claims for Injunctive Orders and Similar Relief.

WHEREAS, on April 5, 2018, Defendants filed an Answer to Hart's Amended Demand for Arbitration and Counterclaims.

WHEREAS, on April 19, 2018, Hart filed an Answer to Defendants' Counterclaims.

WHEREAS, on June 18, 2018, the AAA administratively appointed William J. Tucker as the Arbitrator.

WHEREAS, on December 10, 2018, following motions and briefing, the Arbitrator issued the Interim Award and held that

a. "None of Hart's six claims asserted in her Amended Arbitration Demand are arbitrable, because none of them seek 'money damages.'" Interim Award at 7. The Arbitrator stated that "[c]onspicuously absent from Hart's Amended Arbitration Demand is any reference to, let alone a request for, 'damages,'" that "the 2014 RSSA specifically provides that, 'claims for injunctive orders or similar relief must be brought in a court,'" and '[t]he only relief sought by Hart in her Amended Arbitration Demand is 'injunctive orders or similar relief.'" *Id.* at 5. The Arbitrator further stated that "Hart has chosen to use in the six claims asserted in her Amended Arbitration Demand the very same wording of the arbitration provision in the 2014 RSSA ('injunctive orders or similar relief')," that "[i]t is clear that whatever 'money damages' encompass within the meaning of the arbitration provision, they are not 'injunctive orders or similar relief.'"

b. "Spectrum's First Counterclaim is moot, because it is subsumed in my determination that none of Hart's six claims in her Amended Arbitration Demand seek 'money damages' and, therefore, none are arbitrable." *Id.*

c. "Spectrum's Second Counterclaim and its Third Counterclaim are arbitrable, because they seek 'money damages.'" *Id.*

d. "Spectrum's Second Counterclaim and its Third Counterclaim cannot be determined at this time by way of summary adjudication." *Id.*

WHEREAS, on January 8, 2019, the Arbitrator granted Defendants leave to file a Fourth Counterclaim and for Hart to file an anti-SLAPP special motion to strike Defendants' Second and Third Counterclaims.

WHEREAS, on January 15, 2019, Defendants filed a Fourth Counterclaim, requesting that the Arbitrator enter an award "declaring that any relief sought by Claimant in connection with her six proposed judicial claims in her Amended Demand that would result in the payment of money, whether styled as restitution, disgorgement, or otherwise, is relief that, pursuant to the parties' agreement, the entitlement to which must be arbitrated and cannot be litigated in court."

WHEREAS, on January 29, 2019, Hart filed an Answer to Defendants' Fourth Counterclaim and requested that the Arbitrator rule that "the 2014 RSSA's arbitration clause does not cover any claims that arose in or after 2016," that the Fourth Counterclaim was "not yet ripe," and/or that "equitable remedies such as restitution can only be determined and awarded by a court." On the same date, Hart also filed an anti-SLAPP special motion to strike Defendants' Second and Third Counterclaims.

WHEREAS, on March 29, 2019, following briefing of the anti-SLAPP motion, the Arbitrator issued a Final Award in which he confirmed, adopted, and incorporated the Interim Award and further held: "that anti-SLAPP motions are impermissible in private nonjudicial arbitrations," Final Award at 5; "the attorneys' fees Spectrum requests in its Third Counterclaim are not 'damages' proximately resulting from Hart's alleged breach of contract," *id.* at 6; "the attorney's fees Spectrum requests in its Second Counterclaim are not 'damages' proximately resulting from Hart's alleged breach of contract," *id.* at 8; and "Spectrum's Fourth Counterclaim is meritless." *Id.* at 9.

WHEREAS, the Arbitrator declined to decide what specific forms of relief (*e.g.* restitution, disgorgement, etc.) constitute arbitrable "money damages" or non-arbitrable "injunctive orders or similar relief," and stated that "[s]hould the District Court consider and rule substantively on Hart's causes of action, ruling that the relief she seeks does not constitute 'damages,' my ruling dismissing Spectrum's Fourth Counterclaim will have

been shown to be correct," but, "[i]f, on the other hand, the Court rules that 'restitution' and 'restitutionary disgorgement' are in fact 'damages,' Hart will be precluded from seeking such damages in this arbitration, because this Final Award will end the arbitration," and "[t]hat result would be eminently fair to Hart, since she has taken the position that all the relief she has sought in the arbitration is 'injunctive' and 'all similar relief' which she further contends may be awarded only in court," and "I am simply taking Hart at her word."

WHEREAS, the Final Award issued by the Arbitrator held as follows:

(1)     Hart's anti-SLAPP motion to strike is denied.

(2)     All of Hart's causes of action asserted in this arbitration are dismissed.

(3)     All of Spectrum's counterclaims filed in this arbitration are dismissed.

(4)     There is no prevailing party in this arbitration.

(5)     Neither party is entitled to an award of attorney's fees against the other.

The administrative fees of the American Arbitration Association ("the Association") totaling $2,250, and the compensation and expenses of the arbitrator totaling $4,125 shall be borne as incurred by the parties.

The Award is in full settlement of all claims submitted to this Arbitration. All claims not expressly granted herein are hereby denied.

*Id.* at 10.

The Parties stipulated and jointly moved the Court to (1) issue an order pursuant to the Federal Arbitration Act, 9 U.S.C. sections 9 and 13, confirming the Final Award; (2) file such order with the clerk for the entry of judgment thereon, and (3) file certain papers with the clerk in accordance with 9 U.S.C. section 13.

Having reviewed the 2014 RSSA's arbitration clause and delegation provision, the Court's order dated November 8, 2017 that granted Defendants' motion to compel arbitration, the appointment of the Arbitrator, the Interim Award of Arbitrator dated December 10, 2018, and the Final Award of Arbitrator dated March 29, 2019, and finding no basis to vacate, modify, or correct the Final Award of Arbitrator pursuant to the

Federal Arbitration Act, 9 U.S.C. sections 9 through 11 (the Parties having raised none), and pursuant to the Parties' stipulation, there Court hereby **GRANTS** the Parties' joint motion to confirm the Final Award of Arbitrator in full.

Pursuant to the Federal Arbitration Act, 9 U.S.C. sections 9 and 13, the Court attaches the following papers and instructs the clerk to file them with this **ORDER**:

a. the 2014 RSSA, attached as **Exhibit 1** (also in the Court's record as Dkt. 30-2);

b. the Court order dated November 8, 2017, attached as **Exhibit 2** (also in the Court's record as Dkt. 39);

c. the AAA's appointment of the Arbitrator, attached as **Exhibit 3**;

d. the Interim Award of Arbitrator dated December 10, 2018, incorporated into the Final Award, attached as **Exhibit 4**; and

e. the Final Award of Arbitrator dated March 29, 2018, attached as **Exhibit 5**.

The Parties' joint motion is **GRANTED** and the Final Award of Arbitrator is **CONFIRMED IN FULL.**

Pursuant to the order of the Arbitrator, both sides will bear their own costs, neither side is entitled to an award of attorney's fees against the other, and the administrative fees of arbitration totaling $2,250 and the compensation and expenses of the Arbitrator totaling $4,125 shall be borne as incurred by the parties.

The clerk shall docket this judgment pursuant to Federal Arbitration Act, 9 U.S.C. section 13, and it shall have the same force and effect, in all respects, as, and be subject to all the provisions of law relating to, a judgment in an action.

**IT IS SO ORDERED AND ADJUDGED. LET JUDGMENT BE FORTHWITH ENTERED ACCORDINGLY.**

Dated: April 17, 2019

The Honorable David O. Carter

United States District Judge

# EXHIBIT 1

## Time Warner Cable Residential Services Subscriber Agreement

We provide you and your household members with our **Services** on the condition that you comply with our **Customer Agreements**. These agreements, which are listed below, contain important information regarding your rights and responsibilities. Please review them carefully. The **Customer Agreements** constitute the entire agreement between you and us, and you are not entitled to rely on any other agreements or undertakings made by **TWC** personnel other than as set forth in the **Customer Agreements**.

- Residential Services Subscriber Agreement (this document). This **Agreement** contains the general terms and conditions governing your use of the **Services**.

- Your **Work Order(s)**. We present you with a **Work Order** (either in electronic or print form) when you initiate service or when we visit your home to install additional services or address service problems.

- **Terms of Service**. Our Terms of Service contain information about the **Services** you receive and **TWC**'s policies relating to such matters as billing and customer service.

- **Tariffs.** If **TWC** has filed a **Tariff** with the telephone regulatory authority in your state, then the **Tariff** will govern, in whole or in part, your receipt of our Home Phone Service.

- **Acceptable Use Policy. The "do's" and "don'ts" for use of our** Services.

- **Addenda**. You may have agreed to an **Addendum** to this **Agreement** when you signed up for a special service or a special promotional program.

By signing your **Work Order** (either in electronic or print form) or using our **Services**, you accept (in other words, agree to be legally bound by) these **Customer Agreements** and confirm that, by doing so, you are not violating the terms of any agreement you may have with another provider of **services**. Our website always contains the most current versions of our **Customer Agreements**. See **http://help.twcable.com/policies.html** or contact your local **TWC** office.

> THIS **AGREEMENT** CONTAINS A BINDING "ARIBITRATION CLAUSE," WHICH SAYS THAT YOU AND TWC AGREE TO RESOLVE CERTAIN DISPUTES THROUGH ARBITRATION, AND ALSO CONTAINS A LIMITATION ON YOUR RIGHT TO BRING CLAIMS AGAINST TWC MORE THAN ONE YEAR AFTER THE RELEVANT EVENTS OCCURRED. YOU HAVE THE RIGHT TO OPT OUT OF THIS PART OF THE AGREEMENT. SEE SECTIONS 14, 15 and 16.

Capitalized terms used in this **Agreement** have special meanings, which are contained in **Section 17**. By signing a **Work Order** or using our **Services**, you agree on your behalf and on behalf of your household members as follows:

**1. Your Financial Responsibilities**
**2. Your Responsibilities Regarding Equipment**
**3. Your Right to Use our Services and Property is Limited**
**4. Special Provisions for Home Phone Subscribers**
**5. Special Information for HSD Subscribers**
**6. Objectionable Material and Parental Controls**
**7. If You Have Service Problems, You May Be Entitled to a Credit**
**8. We May Change our Customer Agreements**
**9. We May Enforce our Customer Agreements**
**10. Our Services are Not Guaranteed and Our Liability is Limited.**
**11. Your Privacy Rights and Obligations**
**12. You are Consenting to Phone and Email Contact**
**13. You are Consenting to How We Provide You with Notices and Communications**
**14. Unless You Opy Out, You are Agreeing to Limit the Time You Have to Bring a Legal Action**
**15. Unless you Opt Out, You are Agreeing to Resolve Certain Disputes Through Arbitration**
**16. Opt Out Instructions**

**17. Definitions**
**18. Term of Agreement; Termination of Service**
**19. The Rights of Third Parties**
**20. What Happens if the Law in Your Area Conflicts with our Customer Agreements**
**21. What Happens if There is a Conflict between our Customer Agreements**

## 1. Your Financial Responsibilities

**(a) Charges and Billing.** You must pay for the **Services** you receive or order in accordance with our billing practices, along with any installation or **equipment** charges and other applicable fees and taxes. We reserve the right to change our prices and fees, and to impose new fees, charges and surcharges, including cost recovery surcharges as permitted by law. Certain of our fees are described below. Additional information regarding each of them is available from your local **TWC** office.

**(b) Promotions.** If you are under a promotional offering for a set period of time, you are assured that the price you are charged for the **Services** will not change during that period. However, you are not assured that the **Services** themselves (or the **Customer-Owned Equipment** or **Customer Use Equipment** requirements) will remain the same or that **TWC**'s fees for things other than the **Services** (like **Customer Use Equipment** charges, late payment fees or charges for receiving paper statements) will remain the same. As an example, we offer several different **Video Service** packages, each of which contains a variety of channels, and the channel lineup for each package may change from time to time. In purchasing a **Video Service** package, you are not guaranteed any particular channels and you are not entitled to any compensation if any channels are removed from your video package.

**(c) Late Fees.** If you fail to pay your bill by the due date on your statement, we incur costs that we may pass on to you in the form of late fees and collection fees (including field collection fees that apply if we send someone to your home in an attempt to collect amounts you owe us). Except where late fees are set pursuant to law, these fees are based on the aggregate costs of our collection activities and may change over time and may vary by location. You confirm that these fees are difficult to determine on an individual basis and are reasonable in light of our costs in collecting past due amounts. We are entitled to charge you interest on past due amounts.

**(d) Service Suspension Fees.** If we suspend any of the **Services** we provide to you (for example, because you fail to pay amounts you owe us or because you violate our **Customer Agreements**), we may require that you pay us a fee for restoring your Service in addition to charging you the regular cost for such **Services** during the suspension.

**(e) Bounced Checks.** If your check to us "bounces" (or if your bank or payment card issuer refuses to pay us amounts you have previously authorized us to charge to your account), we may require that you pay us a fee.

**(f) Deposits.** We may require a deposit or other guaranteed form of payment (for example, a payment card or bank account debit authorization) from you. If you owe us money on any account, we can deduct those amounts from any existing credit you have with us or any security deposit you provide or, if applicable, charge them to the bank or payment card account you have authorized us to use.

**(g) Purchase Authorizations.** You authorize us to accept (and charge you for) any orders or requests made from your location or using your account information. For example, if someone in your home makes a long distance Home Phone call or requests a pay channel like HBO, you are responsible for the resulting charges. Similarly, if you provide any person with your **TWC** user name and password, you will be responsible for the costs of anything they order using the information, whether from within your home or outside it.

**(h) Special Offers are, Well, Special.** We are not required to notify you of offers we make available to others, or to change your prices to equal those contained in such offers.

**(i) Billing Errors.** You must bring any billing errors to our attention within 30 days of the day you receive the bill or you will waive any right to (in other words, you will not be eligible to receive) a refund or credit.

**(j) Governmental Fees, Taxes and Surcharges.** Since tax and regulatory rules are subject to interpretation, we have complete discretion in deciding what governmental fees and taxes to collect from you. You waive any right to (in other words, you are not eligible to receive) a refund of any fees or taxes that we collect from you and pay to any government or agency. You can receive a list of the fees and taxes we collect from: Time Warner Cable, 7800 Crescent Executive Drive, Charlotte, North Carolina, 28217; Attention: Subscriber Tax Inquiries.

**(k) Urban Myth Debunked.** You cannot settle amounts you owe us by writing "paid in full" or any other message on your bill or check.

**(l) Replacement Bank and Credit Cards.** If you provide us with a credit or bank card for billing or deposit purposes and the issuer gives you a new card on the account, you authorize us to update our records and to continue to use the account as before.

**(m) Third Party Claims.** If a third party sues us based on your use of our **Services**, **Equipment** or **Software** (for example, claiming theft or copyright infringement based on something you posted on-line using our **HSD Service**), or based on a breach by you of any Customer Agreement(s), you will indemnify us (in other words, reimburse us) for any losses, including reasonable attorneys' fees, that we suffer.

## 2. Your Responsibilities Regarding Equipment

**(a) Access to Equipment.** You will allow us to enter your premises to install, maintain or replace **Equipment** and to make sure our **Services** are operating and being delivered properly to you and your neighbors. If you stop receiving **Services** from us, you may terminate these rights by giving us one year's advance notice. You confirm that you are authorized to grant the rights described in this paragraph.

**(b) Repairs.** After we install or remove **Equipment** or wiring on your premises, you are responsible for any repairs or cosmetic corrections you wish to make. We have an obligation to make such repairs only if we performed our work negligently and your property was damaged as a result.

**(c) Downloads.** We can make changes to **Equipment** and **Software** through downloads from our network or otherwise. To deliver the **Services**, we may from time to time download software and make other changes to **Customer-Owned Equipment**, which may change the features and functionality of **Customer-Owned Equipment**. You represent that you have the authority to grant us access to such **Equipment** to make such changes.

**(d) Equipment Location.** You may not move **Customer Use Equipment** to any location other than the location where you initially received the **Services**. This is true even if you have moved to a new location and continue to pay us for the **Services**.

**(e) Equipment Return.** You must arrange to return the **Customer Use Equipment** to us in good condition when the **Services** are terminated and, if you fail to do so, we have your permission to retrieve **Customer Use Equipment** from your premises at your expense. You are responsible for applicable fees until we receive the **Customer Use Equipment**. If we do not receive the **Customer Use Equipment** within a reasonable amount of time after the **Services** are terminated, we are entitled to assume that you have lost the **Customer Use Equipment**.

**(f) Lost or Damaged Equipment.** If the **Customer Use Equipment** is lost, stolen, damaged or tampered with, you must reimburse us (as "liquidated damages") even if you are not at fault. The liquidated damages amount for **Customer Use Equipment** is available on request from your local **TWC** office. You agree that this liquidated damages approach is reasonable in light of the difficulty of determining the value of the **Customer Use Equipment** or the losses we could suffer if a third party improperly gained access to our **Services** using **Customer Use Equipment** we provided to you.

**(g) Recovered Equipment.** The **Customer Use Equipment** we provide to you always belongs to us even if you reimburse us for the cost of it. If you find or recover lost **equipment**, you must return it to us. You may not remove or alter our logos or other identifying information (for example, serial numbers) on the **Customer Use Equipment**.

## 3. Your Right to Use our Services and Property is Limited

**(a) Our Services May Change.** We can change the **Services**, or require that you obtain new **Customer-Owned Equipment**, or lease new or additional Equipment from us to obtain the full benefit of the **Services**.

**(b) Features and Functionality May Differ.** Our **Services** may operate differently depending on the **equipment** you use to receive them. For instance, if you choose not to lease a set-top box from us, you may be unable to view all available channels for the tier of Service you receive or to perform certain two-way operations. If you use a **TWC App** running on a third party's device, you may have access to a different guide and user experience than if you use a set-top box for the **Video Service**. Different set-top boxes may also deliver different user experiences. Our in-home and out-of-home **Services** may also differ. For example, our out-of-the home wi-fi service may not provide the same **Throughput Rate** that our in-home **HSD Service** provides and our out-of-home **Video Services** may provide fewer channels than our in-home **Video Services**.

**(c) Software License.** We may provide you with **Software** as part of or to help you use our **Services**. We allow you to use such **Software** and other **TWC** intellectual property, but only to the extent necessary to use or receive the related **Services**. The **Software** and other intellectual property always belong to us and our licensors, and you do not have any ownership rights in them or any right to license them to others. We may, but are not obligated to, modify the

**Software**, including through remote downloads to **Customer Use Equipment** or **Customer-Owned Equipment**. If we notify you that a **Software** update is available to you, you should promptly perform the update. If you don't, the **Software**, **Customer Use Equipment** and/or **Customer-Owned Equipment** may not work properly with our **Services**. You represent that you have the authority to grant us access to the **Customer-Owned Equipment** to make such modifications.

**(d) Personal, Non-commercial Use Only.** The **Services** and **Software** are for your reasonable personal, non-commercial use only. You may not examine or manipulate the Software code. You may not share our in-home **Services** or related **Software** with any person who is not a member or guest of your household or to persons outside your premises. You may not enable any person who is not a member of your household to access our out-of-home **Services** or related **Software** (for example, by providing them with your **TWC** user name and password).

**(e) Unauthorized Access.** You will take reasonable precautions to prevent others from gaining unauthorized access to the **Services**. For example, if you establish a user name and password with us that enable you to access our out-of-home **Services**, you will not provide that user name and password to any person other than the members of your household. If you do, we reserve the right to revoke your access credentials or terminate the Services you receive.

**(f) Theft of Service.** If you knowingly access Services that you have not paid for, enable others to access Services that they have not paid for, or damage or alter our **Equipment** (or use **Customer-Owned Equipment**) in order to do so, you will have breached this **Agreement** and possibly subjected yourself to statutory damages, fines or criminal charges. Only **TWC** may service **Customer Use Equipment**. You will not allow anyone else to open, take apart or modify **Customer Use Equipment**

**(g) Deletion of Materials.** We reserve the right, both during the term of this **Agreement** and upon its termination, to delete voicemail messages, email messages, call details, files and other information that is stored on our servers, systems or **Equipment**, in our discretion and in accordance with our storage policies. We might delete this information if, for example, the applicable Service account has gone unused for an extended period of time, if this **Agreement** has been terminated by you or us, or if we replace **Customer Use Equipment** that holds such information. Such deletions also may occur inadvertently. We will not be responsible for any loss or removal of such data or information.

## 4. Special Provisions for Home Phone Subscribers

**(a) Electrical Power is Required.** Home Phone Service is delivered over a broadband connection and, as is the case with a cordless phone, is electrically powered. If your broadband connection or power is interrupted, you may not be able to make or receive calls or use 911, home security or medical monitoring services. This is true even if your cable modem contains a battery.

**(b) Home Security and Medical Monitoring.** The Home Phone Service may not work properly with a third party's home security or medical monitoring system and we accept no responsibility for its performance with such systems. If you intend to use the Home Phone Service with a third party's home security or medical monitoring system, you are responsible for making sure it works properly and for the cost of doing so. You should contact your home security or medical monitoring provider to determine whether the Home Phone Service is compatible with its systems and to test the system's operation with the Home Phone Service.

**(c) 911 Information.** The cable modem that we provide to you for Home Phone Service is linked to the address on your **Work Order**. Ensuring that your address is correctly listed with 911 databases normally takes between 24 and 120 hours from the time that you subscribe to Home Phone Service. If you move the modem to another address, you violate this **Agreement**. Furthermore, if you call 911 from the new address using the modem, emergency personnel will not be able to locate you. Also, as noted above, your Home Phone Service may not be available in the event of an electrical power outage, or if your local **TWC** system experiences service issues, and in those instances you will not be able to use the Home Phone Service to call 911.

**(d) Directory Listing Errors.** If we do not comply with your requests regarding directory listing information (for example, list the wrong number or list a number you requested be unlisted), you may be entitled to a credit under our policies or, if greater, an amount prescribed by applicable regulatory requirements. Please contact your local **TWC** office for more information. Other than these credits, we have no liability with respect to directory listings.

## 5. Special Provisions for HSD Subscribers

**(a) Network Management and Monitoring.** We may use **Network Management Tools** to make our **Services** operate efficiently. We may monitor your bandwidth usage and patterns and your compliance with our **Customer Agreements**.

**(b) HSD Service Level Limits.** Each **HSD Service** level may have a **Maximum Throughput Rate**, a Usage Limit or other characteristics. We can set or change the **Maximum Throughput Rate**, **Usage Limit** or other characteristics of any **HSD Service** level. If we do, we may put in place additional terms to address usage that is not consistent with the resulting **HSD Service** level. For example, if we set or change the **Usage Limit** that applies to your **HSD Service** level and you exceed the limit, we may suspend your **HSD Service**, reduce your **Maximum Throughput Rate** or charge you for your excess usage. You may need to subscribe to a more expensive **HSD Service** level or pay for additional bandwidth to avoid suspension or slower **HSD**. We will notify you of any new or changed **Usage Limit** (or any material reduction in the previously published **Maximum Throughput Rate**) for your **HSD Service** level and any related terms.

**(c) Throughput Rates.** We do not guarantee that you will obtain the **Maximum Throughput Rate** for the level of **HSD Service** to which you subscribe at any given time or on a continuous basis. The **Throughput Rate** you experience at any time will be affected by a number of factors, including the nature of the Internet and its protocols, our facilities, the bandwidth we devote to carriage of protocol and network information, the condition and configuration of our **Equipment** or **Customer-Owned Equipment** at your location, whether you use an in-home wi-fi network (which can significantly limit the **Throughput Rate** obtained by devices attached to it), our use of **Network Management Tools**, data volume and congestion on our network and the Internet, the time of day you are using the **HSD Service**, the performance of the website servers you try to access, and the priority we give to our business subscribers' data traffic and specialized services we deliver using our **Equipment** as described in our Network Management Disclosures.

**(d) Your Transmissions.** If you send or post materials through the **HSD Service**, you are responsible for the material and confirm that you have all necessary rights to do so. You grant us, with no obligation to pay you, all rights we need to complete your transmission or posting. If we determine that the transmission or posting violates our **Customer Agreements**, we may (but have no duty to) delete the materials, block access to them or cancel your account.

**(e) Cable Modems.** The **HSD Service** requires the use of a cable modem. You may lease a cable modem from us for a monthly fee or purchase one from a list of modems authorized for use on our systems. For a list of TWC-authorized modems, see **http://twc.com/approvedmodems**. If you attempt to use a modem that is not on the list, the **HSD Service** will not work. In addition, if you use a modem we do not supply, or if you do not replace the modem we provide when we increase speeds, you may not be capable of obtaining our **Maximum Throughput Rate**.

**(f) Addresses.** Use of the **HSD Service** does not give you any ownership or other rights in any Internet Protocol, email or Internet addresses that may be provided to you as part of the Service. We may modify or change these addresses at any time without notice to you. Upon termination of an **HSD Service** account, we reserve the right to permanently delete or remove any or all addresses associated with such account.

## 6. Objectionable Material and Parental Controls

Our **Services** make available some material that may offend you or be inappropriate for members of your household. **TWC** provides Parental Control(s) and other tools that can filter or block access to certain video programming and Internet content. Parental Control(s) for Internet can be downloaded at **http://twc.com/parentalcontrols**. In order to use our Parental Control(s) for video programming, you generally must lease a Set-Top Box from us or use a **TWC App** that has such capabilities. The availability and effectiveness of these tools may vary. Even if you use the parental controls we provide and they work as intended, you may be exposed to materials you find objectionable.

## 7. If You Have Service Problems, You May Be Entitled to a Credit

**(a) Service Problems.** We will attempt to correct service problems caused by our **Equipment** or **Software** but we are not required to install, service or replace **Customer-Owned Equipment** or software. Depending on the circumstances, we may charge you for service calls. For more information, please contact your local **TWC** office.

**(b) Outages and Credits. TWC** has no liability for service interruptions except that, if you lose all Video, HSD or Home Phone Service for more than 24 consecutive hours and the cause of the outage was within our reasonable control (excluding service suspensions resulting from your failure to pay amounts you owe us or for violations of our **Customer Agreements**), we will provide you a credit for that period if you request one. If you experience a service problem with a VOD transaction, we will issue you a credit for the amount of the VOD purchase if you request one. All

credit requests must be made within 30 days of your next bill following the outage or service issue. Unless required by law, such credit will not exceed the fixed monthly charges for the month of such Service(s) interruption and will exclude all nonrecurring charges, one-time charges, per call or measured charges, regulatory fees and surcharges, taxes and other governmental and quasi-governmental fees. UNLESS PROHIBITED BY LAW, SUCH CREDIT WILL BE YOUR SOLE AND EXCLUSIVE REMEDY FOR AN INTERRUPTION OF SERVICE(S).

**(c) Force Majeure.** We have no responsibility for service problems that are beyond our reasonable control. Examples of problems beyond our reasonable control include those caused by storms and other natural disasters, vandalism, terrorism, regulations or governmental acts, fires, civil disturbances, electrical power outages, computer viruses or strikes.

**(d) Applicable Laws.** Applicable law may impose other outage credit requirements with respect to some or all of the **Services**. If this is the case, we will follow the law.

**(e) Non-TWC Equipment.** Our **Services** may not work with **Customer-Owned Equipment**, or other **equipment**, software or services that we did not provide to you. For example, some "cable ready" or "digital cable ready" televisions and DVRs may not receive or support all of our **Video Services** even if we provide you with a CableCARD™ as may be recommended by the device manufacturer. To get the full benefit of our **Services**, you may need to lease **Customer Use Equipment** from us.

## 8. We May Change our Customer Agreements

**(a) Changes May be Made Online.** We may change our **Customer Agreements** by amending the online version of the relevant document.

**(b) Effectiveness.** Any change to a Customer Agreement will only become binding on you 30 days after we make that change. If you continue to use the **Services** following such 30-day period, you will have accepted (in other words, agreed to be legally bound by) the change. If you do not agree to the change, you will need to contact your local **TWC** office to cancel the **Services** you receive from us.

**(c) Notice as to Certain Changes.** We will provide you at least 30 days' notice of any material change to the provisions that limit the time to commence a legal action contained in Section 14 or the arbitration provisions contained in Section 15 of this **Agreement** and any such change will become effective only after such notice period has run.

**(d) Changes are Prospective Only.** Any change to a Customer Agreement is intended to be prospective only. In other words, the amended version of the relevant document begins to apply only as of the end of the 30-day period noted above.

## 9. If You Violate our Customer Agreements

**(a) We Can Suspend or Terminate the Service.** If we think you have violated our **Customer Agreements**, we have the right to suspend or terminate any or all of the **Services** we provide to you (including your rights to use any **Software**) without prior notification.

**(b) Charges While Service Suspended.** If we choose to suspend your Service, we may do so electronically and we may require that you pay us a fee for restoring your Service in addition to charging you the regular cost for such Service during the suspension. Service restoration fees are available from your local **TWC** office.

**(c) We Can Pursue other Remedies.** If we think you have violated our **Customer Agreements** we have the right to seek compensation from you through arbitration or, if you have opted out of this **Agreement**'s arbitration provisions as permitted under Section 15, or if we are seeking a court order that requires you to take or cease taking any action, by suing you in court.

**(d) No Waiver. TWC** does not waive (in other words, give up) any rights under our **Customer Agreements** just because we have not previously enforced such rights. To be legally binding on us, any waiver we grant must be in writing. If we waive a violation of our **Customer Agreements**, it does not mean that we are waiving other rights, including in respect of earlier or later violations.

## 10. Our Services are Not Guaranteed and Our Liability is Limited

**(a) NO WARRANTIES.** OUR **SERVICES** (WHICH, FOR PURPOSES OF THIS SECTION 10, ALSO REFERS TO OUR **EQUIPMENT** AND **SOFTWARE**) ARE NOT GUARANTEED TO WORK, TO BE ERROR- OR VIRUS-FREE, OR TO BE COMPATIBLE WITH ANY **SERVICES**, **EQUIPMENT** OR **SOFTWARE** NOT PROVIDED TO YOU BY **TWC** OR OUR LICENSORS OR SUPPLIERS (INCLUDING **CUSTOMER-OWNED EQUIPMENT**). OUR **SERVICES** ARE PROVIDED ON AN "AS IS" AND "AS AVAILABLE" BASIS. NEITHER WE NOR OUR LICENSORS OR SUPPLIERS MAKE ANY WARRANTIES OF ANY KIND WITH RESPECT TO THESE **SERVICES**. THIS INCLUDES

SO-CALLED "IMPLIED WARRANTIES" (SUCH AS THOSE OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE). IF THE LAW WHERE YOU LIVE SAYS WE CANNOT EXCLUDE CERTAIN WARRANTIES, THEN THOSE WARRANTIES ARE NOT EXCLUDED.

**(b) TWC'S LIABILITY IS LIMITED.** EXCEPT FOR THE DIRECTORY LISTING SERVICE CREDITS DESCRIBED IN SECTION 4 AND THE SERVICE INTERRUPTION CREDITS DESCRIBED IN SECTION 7 OF THIS **AGREEMENT**, NEITHER WE NOR OUR EMPLOYEES, AGENTS, LICENSORS OR SUPPLIERS WILL BE LIABLE TO YOU FOR ANY LOSSES OR DAMAGES OF ANY KIND BASED DIRECTLY OR INDIRECTLY ON YOUR RELATIONSHIP WITH US OR OUR PROVISION OF THE **SERVICES**, WHETHER BASED ON BREACH OF CONTRACT, TORT (FOR EXAMPLE, A NEGLIGENCE OR PRODUCT LIABILITY CLAIM), VIOLATION OF LAW OR REGULATION OR ANY OTHER LEGAL THEORY. FOR EXAMPLE, WE ARE NOT LIABLE TO YOU FOR LOSSES OR DAMAGES THAT RESULT FROM YOUR USE OR INABILITY TO USE THE **SERVICES** (INCLUDING 911 SERVICES), OR FOR ANY LOSSES OR DAMAGES THAT MAY RESULT FROM INSTALLATION, USE, MODIFICATION, REPAIR OR REMOVAL OF **CUSTOMER USE EQUIPMENT** OR **CUSTOMER-OWNED EQUIPMENT**. IN NO EVENT WILL WE BE REQUIRED TO CREDIT YOU AN AMOUNT IN EXCESS OF YOUR SERVICE FEES FOR THE MONTH DURING WHICH YOU SUFFER ANY LOSSES OR DAMAGES.

**(c) SECURE YOUR COMMUNICATIONS AND DATA.** THE **SERVICES** AND THE COMMUNICATIONS YOU MAKE USING THEM MAY NOT BE SECURE. YOU ARE RESPONSIBLE FOR SECURING YOUR COMMUNICATIONS AND DATA. **TWC** WILL NOT BE RESPONSIBLE IF A THIRD PARTY GAINS ACCESS TO THE **SERVICES**, THE **CUSTOMER-OWNED EQUIPMENT**, OR YOUR COMMUNICATIONS OR DATA.

**(d) DAMAGE OR LOSS TO YOUR PROPERTY.** THE SERVICES MAY RESULT IN DAMAGE OR LOSS TO YOUR OWN SERVICES, **EQUIPMENT** (INCLUDING **CUSTOMER-OWNED EQUIPMENT**), **SOFTWARE** AND DATA (INCLUDING YOUR PERSONAL FILES). WE ARE NOT RESPONSIBLE FOR ANY SUCH DAMAGE OR LOSS. THIS INCLUDES DAMAGE OR LOSS RESULTING FROM SOFTWARE DOWNLOADS OR OTHER CHANGES OR MODIFICATIONS THAT ARE MADE TO **CUSTOMER-OWNED EQUIPMENT** AS CONTEMPLATED IN THIS **AGREEMENT**.

## 11. Your Privacy Rights and Obligations

**(a) Applicable Law.** Your privacy interests, including your ability to limit disclosure of certain information to third parties, are addressed by, among other laws, the Federal Communications Act of 1934, as amended, and the Electronic Communications Privacy Act. You grant us permission to collect, use or disclose your personal information as described in our Subscriber Privacy Notice.

**(b) TWC's Privacy Policy.** In accordance with applicable law and our own practices, we give each new customer our Subscriber Privacy Notice at installation and provide all customers with our Subscriber Privacy Notice at least annually. You may obtain the Subscriber Privacy Notice at **http://help.twcable.com/policies.html** or from your local **TWC** office.

**(c) Information from Interactive Services.** When you or members of your household use interactive features of our **Services** or **Software**, you may provide us or third parties with your personal information. For more information regarding our collection, use and disclosure of your personal information, see our **Subscriber Privacy Notice**.

**(d) Exceptions. TWC** may (but has no duty to) disclose any information that it believes appropriate to protect its rights, comply with law, safeguard its personnel, property and operations, or where it believes that individual or public safety is in peril.

**(e) Safeguard Your Account Information.** You are responsible for protecting the information needed to securely access your account information and verify orders (for example, your social security number or passwords that we may issue to you). If someone else acquires this information (through no fault of ours), we may assume that you have authorized that person's use of the information and we may provide your personal information to that person as if they were you.

## 12. You are Consenting to Phone and Email Contact

**(a) Phone Calls.** We may call or text you or authorize others to call or text you on our behalf using any number you provide to us (or that we issue to you) for any purpose, including marketing of our **Services**. This is true even if your numbers are included on state or federal "do not call" lists. You are responsible for charges for incoming text messages on your wireless phone. However, if you ask to have your number placed on our "do not call" list, we will not call or text you (or authorize others to call or text you) at that number for marketing purposes. To have your number placed on our "do not call" list, contact your local **TWC** office.

**(b) Robo-Calls.** We (or persons acting on our behalf) may use automated dialing systems or artificial or recorded voices to contact you or leave you messages if you do not answer.

**(c) Recording of Calls.** You agree that we may monitor or record your telephone conversations with us (whether we call you, or you call us). If you do not wish your telephone conversations with us to be monitored or recorded, you should conduct any business with us in person at your local **TWC** office.

**(d) Emails.** We may email you or authorize others to email you on our behalf using any address you provide to us (or that we issue to you) for any purpose, including marketing of our **Services**. If you ask to have your address placed on our "do not email" list, we will not email (or authorize others to email) marketing messages to you at that address. To have your address placed on our "do not email" list, contact your local **TWC** office.

### 13. You are Consenting to How We Provide You with Notices and Communications

**(a) Video Lineup Changes.** You authorize us to provide required notices to you regarding channel line-up changes and other changes to our **Services** by providing the relevant information on our website, on your monthly bill, as a bill insert, via email, in a newspaper or by any other communication permitted under applicable law.

**(b) Other Notices.** You authorize us to provide other notices to you using any method we determine appropriate, including by electronic means (for example, email or online posting).

**(c) Other Consents.** We may ask you to provide consents or authorizations, including by electronic means including email or your **equipment** (for instance, using your remote control to purchase a VOD movie, to request information regarding an advertiser's products or to "opt in" to a consumer study), and we are entitled to assume that any consent or authorization we receive through your **Services** or from your location has been authorized by you.

**(d) Email Address for Notice.** Upon our request, you will provide us with a current email address that you regularly check so that we may provide notices and communications to you at that address. If you stop using that email address, you will provide us with a new address for such purposes.

### 14. Unless You Opt Out, You are Agreeing to Limit the Time You Have to Bring a Legal Action

**(a) One Year Limit.** You waive (in other words, give up) the right to commence any proceeding against **TWC** if the relevant events occurred more than one year earlier.

**(b) Opt Out.** You may opt out of the waiver set forth in this section. If you do so, the normal statute of limitations in your area will apply to any claims you may wish to assert. To opt out, you must notify **TWC** using one of the methods described in Section 16, below, within 30 days of the date that you first became subject to this provision (i.e., the date you first became subject to our **Customer Agreements** by signing a **Work Order** or using our **Services** or, if this Section 14 (or a predecessor version that is not materially different from this Section 14) was not then a part of the **Customer Agreements**, then the date that this Section 14 became binding on you in accordance with the terms of Section 8(c), above).

### 15. Unless you Opt Out, You are Agreeing to Resolve Certain Disputes Through Arbitration

**(a) Arbitration or Small Claims Court.** Our goal is to resolve Disputes fairly and quickly. However, if we cannot resolve a **Dispute** with you, then, except as described elsewhere in **Section 15**, each of us agrees to submit the **Dispute** to the American Arbitration Association for resolution under its Commercial Arbitration Rules or, by separate mutual agreement, to another arbitration institution. As an alternative, you may bring your claim in your local "small claims" court, if its rules permit it. If you bring an action in small claims court, you waive (unless local law prohibits such a waiver) discovery in that proceeding (in other words, unless local law prohibits you from doing so, you agree you will not be able to depose **TWC** witnesses or seek non-public documents).

**(b) Types of Claims.** Each of us may bring claims against the other only on their own behalf, and not on behalf of any official or other person, or any class of people, and neither of us may bring claims against the other alongside or with claims, whether similar or not, brought by other people. Only claims for money damages may be submitted to arbitration; claims for injunctive orders or similar relief must be brought in a court (other than claims relating to whether arbitration is appropriate, which will be decided by an arbitrator, not a court). You may not combine a claim that is subject to arbitration under this **Agreement** with a claim that is not eligible for arbitration under this **Agreement**.

**(c) Arbitration Decisions.** The arbitrator will issue an award decision in writing but will not provide an explanation for the award unless you or **TWC** requests one. Any arbitration award over $75,000 may be appealed to a three-person panel appointed by the same arbitration institution that rendered the original award. Any such appeal must be filed within 30 days and the appeal will be decided, based on that institution's appeal rules, within 120 days of filing.

**(d) Costs**. Before you initiate an arbitration proceeding, you may request that we advance on your behalf (1) the arbitration filing fees (but only to the extent they exceed your local small claims court filing fees) and (2) the portion of the arbitrator's costs for which you would normally be responsible. If **TWC** wins the arbitration, you will reimburse us for these advances. **TWC** will, of course, pay any fees or costs required under the law where you live.

**(e) Opt Out.** You may opt out of this **Agreement**'s arbitration provision. If you do so, neither you nor **TWC** can require the other to participate in an arbitration proceeding and each us can sue the other in a court of law. To opt out, you must notify **TWC** using one of the methods described in Section 16, below, within 30 days of the date that you first became subject to this arbitration provision (i.e., the date you first became subject to our **Customer Agreements** by signing a **Work Order** or using our **Services** or, if this Section 15 (or a predecessor version that is not materially different from this Section 15) was not then a part of the **Customer Agreements**, then the date that this Section 15 became binding on you in accordance with the terms of Section 8(c), above).

**(f) Enforcement.** If the prohibition against class action and other claims brought on behalf of third parties contained in Section 15(b) is found to be unenforceable, then all of Section 15 other than subsection (g), below, will be null and void.

**(g) Jury Waiver.** Any **Dispute** properly brought in a court of law in connection with our **Customer Agreements** (including this **Agreement**) will be heard and decided by a judge, not a jury. Each of us waives (in other words, gives up) the right to a jury trial in any such **Dispute**.


## 16. Opt Out Instructions

To opt out of the time limitation on claims that is set forth in Section 14, above, or the arbitration provisions in Section 15, above, you must use one of the following notification methods:

Send a written opt out request to:

Time Warner Cable
60 Columbus Circle, Rm 16-329
New York, NY 10023
Attn: Senior Director, Compliance and Legal Affairs

You must include in your written request your name, address and **TWC** account number and a clear statement that you wish to opt out of this **Agreement**'s arbitration obligation and/or that you wish to opt out of this **Agreement**'s 1-year limitation on your right to bring claims.

or

Visit the appropriate URL noted below and complete all required information:

To opt out of Section 14: **http://www.timewarnercable.com/en/about-us/legal/privacy-policy/statute-of-limitations-opt-out.html**
To opt out of Section 15: **http://www.timewarnercable.com/en/about-us/legal/privacy-policy/arbitration-opt-out.html**


## 17. Definitions

**(a) "Addendum"** means a document that you agree to when you sign up for or use a special TWC service or promotional program. The Addendum supplements the terms of our other Customer Agreements for purposes of the relevant special service or promotional program.

**(b) "Agreement"** means this Residential Services Subscriber Agreement, as amended from time to time.

**(c) "Customer Agreements"** refers to the agreements, notices and policies described in the introduction to this Agreement.

**(d) "Customer-Owned Equipment"** means any devices and equipment that are owned by you, whether purchased from us or someone else, and used by you to receive the Services. Customer-Owned Equipment does not include **Customer Use Equipment**.

**(e) "Customer Use Equipment"** means the converter boxes, cable modems, remote controls and other devices and pieces of equipment that we provide to you to receive the Services and that you must return to us if the Service is cancelled.

**(f) "Dispute"** means any dispute, claim, or controversy between you and TWC regarding any aspect of your relationship with us or any conduct or failure to act on our part, including claims based on breach of contract, tort (for

example, a negligence or product liability claim), violation of law or any claims based on any other theory, and including those based on events that occurred prior to the date of this Agreement.

**(g) "Equipment"** means **Customer Use Equipment** and other equipment utilized in connection with the Services. Equipment does not include wiring on your premises and does not include **Customer-Owned Equipment**.

**(h) "HSD Service"** and **"High Speed Data Service"** means our broadband Internet service (including when distributed over an in-home wi-fi network) and wireless data services (including our out-of-home wi-fi service).

**(i) "including"** or **"include"** means inclusion without limitation.

**(j) "Maximum Throughput Rate"** means the highest Throughput Rate that is provided by your level or tier of HSD or Wireless Data Service.

**(k) "Network Management Tools"** are the tools and techniques we use to manage our network, ensure a quality user experience and ensure compliance with our Acceptable Use Policy. Examples of some Network Management Tools can be found in our Acceptable Use Policy and Network Management Disclosures. See http://help.twcable.com/html/policies.html or contact your local TWC office.

**(l) "Services"** refers to the services and features you receive or order from us. These may include video, high speed data, wireless data, home security and monitoring, and Home Phone services, equipment-based services like DVR service, and free services that you may use in connection with any of our paid services. "In-home Services" refer to Services that you use in your home; "out-of-home Services" refer to Services that you can use outside your home (for example, wi-fi service you access in a public place through your TWC account and video programming you can watch outside your home using a **TWC App** or TWCTV.com).

**(m) "Software"** refers to any software that we or our licensors provide or make available to you in connection with our Services, including any software that has been downloaded to **Customer Use Equipment** or **Customer-Owned Equipment** as contemplated in this Agreement.

**(n) "Tariff(s)"** are the materials TWC files with your local Public Service Commission (or similar state agency) that describe some of the terms on which we offer our Home Phone Service.

**((o) "Throughput Rate"** refers to the rate at which data can be transferred between your location and our facilities over a given period of time. The Throughput Rates that we mention in our marketing and other materials refer to our **Maximum Throughput Rates**.

**(p) "TWC"** means Time Warner Cable Inc. and our subsidiaries that provide our Services, or any cable operator to whom we assign this Agreement.

**(q) "TWC App"** means Software that we make available directly or through a third party that allows you to use a third party's device to access TWC Services.

**(r) "Usage Limit"** means the aggregate amount of **"upstream"** and **"downstream"** data that may be transferred between your location and our facilities in a prescribed period (for example, a monthly billing period). If you are unsure of whether your **HSD Service** level has a Usage Limit or how to monitor your data usage, check with your local TWC office.

**(s) "Video Service"** refers to the video and/or audio programming Services we provide, including VOD offerings.

**(t) "Work Order"** means any TWC work or service order(s) that we have provided to you or provide in the future. We provide you with a Work Order when you initiate service or when we visit your home (for example, to install additional services or correct service problems). If you require a copy of any Work Order we have provided to you, please contact your local TWC office.

**(u) Headings.** Headings used in this Agreement are for convenience only, do not form a part of this Agreement and will not affect the meaning or interpretation of this Agreement.

## 18. Term of Agreement; Termination of Service

**(a) Survival of Terms.** The terms of this **Agreement** relating to the rights in and to **Software** (Sections 3(b) and 3(c)), limitations on liability and warranty disclaimers (Section 10), the time period within which you may bring claims (Section 14), resolution of **disputes** (Section 15), our obligation to grant you service credits (Sections 4 and 7) and your obligation to pay us and to indemnify us for certain third-party claims (Section 1) will survive (in other words, continue to apply to you even after) the termination of this **Agreement**.

**(b) Term.** This **Agreement** remains in effect until you no longer receive any of the **Services** and any balance on your account has been paid in full or waived in writing by us.

**(c) Our Right to Terminate.** We may terminate your **Services** and your rights to use any **Software** or **Equipment** at any time for any or no reason, including if we determine that you or a member of your household has received **Services** from us in the past and failed to pay amounts owed to us.

**(d) Your Right to Terminate.** If you wish to terminate Services, you must notify us and either return any Customer Use Equipment to us or provide us with reasonable opportunity to schedule a visit to your location to disconnect the Services and recover Customer Use Equipment.

**(e) Another Urban Myth Dispelled.** You cannot terminate **Services** by writing "canceled" or any other message on your bill or check.

## 19. The Rights of Third Parties

**(a) No Transfers or Assignments.** Except with our consent, you may not transfer or assign to any other person (in other words, make another person legally responsible for) the **Services**, the **Software**, the **Customer Use Equipment** or your obligation to comply with our **Customer Agreements**

**(b) Contractors and Licensors.** We may use contractors to assist us in providing the **Services** and we may provide you with **Software** or **Equipment** that is owned or manufactured by a third-party. If you bring a claim against these contractors or third parties, they have the same rights that we have under our **Customer Agreements**.

**(c) No other Third Party Beneficiaries.** Other than contractors and licensors mentioned in the preceding paragraph, our **Customer Agreements** are not intended to benefit (in other words, to create any rights or obligations for) anyone other than you and us.

## 20. What Happens if the Law in Your Area Conflicts with our Customer Agreements

**(a) Conflict with Local Law.** Our **Customer Agreements** may be the subject of legal requirements that apply where you live or where we provide **Services** to you. If such a requirement conflicts with our **Customer Agreements** with respect to one or more **Services**, the legal requirement will take priority over the part of our **Customer Agreements** with which it conflicts, but only with respect to that part and only with respect to the **Services** to which such legal requirement applies.

**(b) Partial Invalidity.** If a court or similar body determines that a portion of a Customer Agreement is invalid or unenforceable, the rest of the agreement should stand. The surviving portions of the relevant Customer Agreement should be interpreted as closely as possible (consistent with the law in your area) so as to reflect the intention of the original. The only exception to this is that described in **Section 15** regarding Arbitration.

## 21. What Happens if There is a Conflict between our Customer Agreements

**(a) English Language Version Controls.** If we have provided you with a non-English translation of any our **Customer Agreements**, the English language version of that Customer Agreement will govern your relationship with **TWC** and will control in the event of a conflict. The translation is provided as a convenience only.

**(b) Conflicts with Work Order.** In the event of a conflict between the terms of this **Agreement** and your **Work Order**, then the terms of this **Agreement** control.

**(c) Conflicts with Certain Other Agreements.** In the event of a conflict between the terms of this **Agreement** and the terms of any **Addendum** or our Terms of Service, then the terms of the other document will control with respect to the applicable Service.

January 2014

# EXHIBIT 2

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

JS-6

### CIVIL MINUTES – GENERAL

Case No. SA CV 17-0556-DOC (RAOx)                    Date:  November 8, 2017

Title: ELIZABETH HART ET AL V. CHARTER COMMUNICATIONS, INC. ET AL

PRESENT:

THE HONORABLE DAVID O. CARTER, JUDGE

| Deborah Lewman | Not Present |
|---|---|
| Courtroom Clerk | Court Reporter |

| ATTORNEYS PRESENT FOR PLAINTIFF: | ATTORNEYS PRESENT FOR DEFENDANT: |
|---|---|
| None Present | None Present |

**PROCEEDINGS (IN CHAMBERS):    ORDER GRANTING DEFENDANTS' MOTION TO COMPEL ARBITRATION [30]**

Before the Court is Defendants Charter Communications, Inc. and Spectrum Management Holding Company LLC's (collectively, "Defendants") Motion to Compel Arbitration and to Stay Plaintiffs' Claims ("Motion") (Dkt. 30). The Court finds this matter appropriate for resolution without oral argument. *See* Fed. R. Civ. P. 78; L.R. 7-15. Having reviewed the moving papers and considered the parties' arguments, the Court GRANTS Defendants' Motion.

I.     **Background**

A.     **Facts**

Plaintiffs Elizabeth Hart and Le'Roy Roberson (collectively, "Plaintiffs") were subscribers to the Internet services of Time Warner Cable Inc. ("TWC"). First Amended Class Action Complaint ("FAC") (Dkt. 29) ¶¶ 19, 21. In 2016, "as part of a series of corporate transactions, . . . TWC merged with and into" Defendants. *Id.* ¶ 8; *see also id.* at 2 (asserting Defendant Spectrum Holding Company LLC was "formerly known as 'Time Warner Cable'"); Declaration of Daniel J. Bollinger ("Bollinger Decl.") (Dkt. 34-1) ¶¶ 4–8 & Exs. A–B (Dkts. 34-2, 34-3).

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 17-0556-DOC (RAOx)                                    Date: November 8, 2017
                                                                                                        Page 2

In this putative class action, Plaintiffs allege that Defendants do not provide Internet connections that are as fast as advertised because they "failed to provide a network and infrastructure capable of supporting all of its subscribers and their promised Internet speeds." FAC ¶ 24. The FAC also asserts that Defendants increased charges to consumers without adequate notice. *Id.* ¶ 25.

Defendants attest that, to receive residential Internet services, their subscribers agree to be bound by a Residential Services Subscriber Agreement ("RSSA"), which contains an arbitration provision. Declaration of Christine Flores ("Flores Decl.") (Dkt. 30-1) ¶¶ 7, 11. Defendants identify several iterations of the RSSA that they contend applied to Plaintiffs: a version operative between April 2010 and January 2014 ("2010 RSSA"), a version operative between January 2014 and April 2016 ("2014 RSSA"), and a version operative between April 2016 and June 2017 ("2016 RSSA").[1] *Id.* ¶¶ 8–9, 34; *see id.* Exs. A–B, I (Dkts. 30-2,30-3, 30-10). The first page of the 2014 RSSA notes, in a gray box with red, all-caps text offset from the rest of the text on the page, that the document "CONTAINS A BINDING 'ARBITRATION CLAUSE,' WHICH SAYS THAT YOU AND TWC AGREE TO RESOLVE CERTAIN DISPUTES THROUGH ARBITRATION . . . . YOU HAVE THE RIGHT TO OPT OUT OF THIS PART OF THE AGREEMENT." *Id.* Ex. A at 9. In pertinent part, the 2014 RSSA's arbitration provision reads:

> [E]ach of us agrees to submit [a] Dispute to the American Arbitration Association [("AAA")] for resolution under its Commercial Arbitration Rules or, by separate mutual agreement, to another arbitration institution. . . . Only claims for money damages may be submitted to arbitration; claims for injunctive orders or similar relief must be brought in a court (other than claims relating to whether arbitration is appropriate, which will be decided by an arbitrator, not a court). You may not combine a claim that is subject to arbitration under this Agreement with a claim that is not eligible for arbitration under this Agreement. . . . You may opt out of this Agreement's arbitration provision. . . . To opt out, you must notify TWC . . . within 30 days of the date that you first became subject to this arbitration provision (i.e., the date you first became subject to our Customer Agreements by signing a Work Order or using our

---

[1] Despite asserting that prior RSSAs also contained arbitration provisions, Defendants have not produced any RSSAs operative before April 2010 that may have bound Plaintiff Hart, who has been a subscriber since 2006. Flores Decl. ¶¶ 5, 11; *see* FAC ¶ 19.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 17-0556-DOC (RAOx)                    Date: November 8, 2017
                                                                                     Page 3

> Services or, if this Section 15 (or a predecessor version that is not
> materially different from this Section 15) was not then a part of the
> Customer Agreements, then the date that this Section 15 became
> binding on you in accordance with the terms of Section 8(c), above).

*Id.* at 16–17.

Section 8(c) of the 2014 RSSA states: "We will provide you at least 30 days'
notice of any material change to . . . the arbitration provisions contained in Section 15 of
this Agreement and any such change will become effective only after such notice period
has run." *Id.* at 14. Further, section 18(a) of the agreement stated that the provision
governing resolution of disputes "will survive (in other words, continue to apply to you
even after) the termination of this Agreement." *Id.* at 18.

Plaintiffs' March and May 2014 billing statements advised that a "new TWC
subscriber agreement"—that is, the 2014 RSSA—would apply to them. Flores Decl.
¶¶ 21–26 & Exs. C–F (Dkt. 30-4 to 30-7); *see* Declaration of Elizabeth Hart ("Hart
Decl.") (Dkt. 33-14) ¶¶ 4, 6. This advisement, which appears on the same page as the
statement of amount due and payment due date, indicates that the new agreement
"contains an arbitration clause," and implores the reader to "[r]eview it &, if you wish,
'opt out' of some of the clauses at http://help.twcable.com/policies.html." Flores Decl.
¶¶ 21–23 & Exs. C–D; *see id.* ¶¶ 24–26 & Exs. E–F ("Review & 'opt out' of some of the
clauses if you wish . . . ."). These billing statements were sent via U.S. mail to both
Plaintiffs. Flores Decl. ¶¶ 21–22, 24–25; Declaration of Sara Foust-Skudler ("Foust-
Skudler Decl.") (Dkt. 34-4) ¶¶ 3–4; *see id.* ¶¶ 10–11 ("[T]hose unpaid balances
automatically caused these Billing Statements to be sent to Mr. Roberson's address of
record on his Spectrum account by U.S. Mail."); *cf.* Declaration of Le'Roy Roberson
("Roberson Decl.") (Dkt. 33-9) ¶ 4 ("I have occasionally missed the monthly email and
see an overdue balance the next month."); *but see id.* ("I have never been shown or sent
any copy of a billing statement . . . .").

Plaintiffs did not attempt to opt out of any RSSA until March 2017, when
Defendants sent them billing statements reminding them of "terms and conditions
applicable to their services." *See* Flores Decl. ¶ 40; Roberson Decl. ¶ 6 & Exs. A–B
(Dkts. 33-10, 33-11); Hart Decl. ¶ 6 & Exs. B–C (Dkts. 33-16, 33-17). After receiving
these billing statements, both Plaintiffs, on March 15, 2017, sent letters attempting to opt
out of the 2016 RSSA. Flores Decl. ¶ 40; Roberson Decl. ¶ 6 & Ex. B; Hart Decl. ¶ 6 &
Ex. C. On June 21, 2017 and July 10, 2017, Hart and Roberson, respectively, also sent

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 17-0556-DOC (RAOx)                    Date: November 8, 2017
                                                                    Page 4

letters purporting to opt out of the 2017 RSSA. Flores Decl. ¶ 41; Roberson Decl. ¶ 6 & Ex. D (Dkt. 33-13); Hart Decl. ¶ 6.

### B.    Procedural History

Plaintiffs filed this putative class action suit on March 28, 2017 (Dkt. 1). On June 26, 2017, Plaintiffs filed the operative Complaint, the FAC, asserting six claims against Defendants: (1) violation of the Lanham Act, 15 U.S.C. § 1125; (2) violation of the California False Advertising Law, Cal. Bus. & Prof. Code § 17500 *et seq.*; (3) violation of the California Automatic Renewal Law, Cal. Bus. & Prof. Code § 17600 *et seq.*; (4) violation of the California Consumers Legal Remedies Act, Cal. Civ. Code § 1750 *et seq.*; (5) violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*; and (6) restitution and unjust enrichment. *See* FAC ¶¶ 41–84.

Defendants filed the instant Motion on July 24, 2017. Plaintiffs opposed on August 15, 2017 ("Opp'n") (Dkt. 33); Defendants replied on September 6, 2017 ("Reply") (Dkt. 34).

## II.    Legal Standard

"[A]n agreement to arbitrate is a matter of contract." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). "[I]t is a way to resolve those disputes—but only those disputes—the parties have agreed to submit to arbitration." *Id.* (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995)). The party seeking to compel arbitration "bears 'the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence.'" *Norcia v. Samsung Telecoms. Am., LLC*, 845 F.3d 1279, 1283 (9th Cir. 2017) (quoting *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014)).

The Federal Arbitration Act ("FAA") provides that any arbitration agreement within its scope "shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2. The FAA "permits any party 'aggrieved by the alleged . . . refusal of another to arbitrate' to petition any federal district court for an order compelling arbitration in the manner provided for in the agreement." *Chiron Corp.*, 207 F.3d at 1130 (quoting 9 U.S.C. § 4). The Act "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218 (1985). When a party moves to compel arbitration, interpreting the parties' intent on

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 17-0556-DOC (RAOx)                    Date: November 8, 2017
                                                                          Page 5

certain issues in the agreement remains "within the province of judicial review." *Momot v. Mastro*, 652 F.3d 982, 987 (9th Cir. 2011).

When a court is satisfied that an issue in an action is referable to arbitration, it "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3.

## III. Discussion

Defendants argue that this action should be compelled into arbitration and that district court proceedings should be stayed, because at least one of the RSSAs binds Plaintiffs to arbitrate their claims. Mot. at 5–6. In response, Plaintiffs assert that none of the RSSAs bind them, and that, even if they are bound, Defendants cannot enforce an agreement to arbitrate with TWC. *See* Opp'n at 1–3.

### A. The 2014 RSSA Binds Plaintiffs

Defendants proffer several theories by which they contend Plaintiffs are bound to TWC's 2016, 2014, 2010, or earlier RSSAs, which contain provisions for the arbitration of Plaintiffs' claims. Defendants claim that: (1) Plaintiffs are bound to all the RSSAs because they accepted Defendants' Internet services; (2) Plaintiffs are bound to the 2010 RSSA because they signed work orders in 2013 confirming they were bound to the 2010 agreement; (3) Plaintiffs are bound to the 2014 RSSA because they were given notice of the revised agreement in their March and May 2014 billing statements; (4) Plaintiffs are bound to the 2014 RSSA because they signed work orders in 2015 confirming they were bound to the 2014 agreement; and (5) Plaintiffs are bound to the 2016 agreement because Defendants posted the agreement on their website. *See* Motion at 5–9. Plaintiffs dispute that they agreed to any of these RSSAs, arguing that Defendants did not give them reasonable notice of the RSSAs and that Defendants did not secure Plaintiffs' knowing consent. *See* Opp'n at 10–19.

Whether Plaintiffs are bound by any of the RSSAs is a question of contract law that turns on whether the Plaintiffs entered into a legally enforceable contract with TWC. Under California law, an essential element of any contract is the mutual consent of the parties, which usually requires "an offer communicated to the offeree and an acceptance communicated to the offeror." *Donovan v. RRL Corp.*, 26 Cal. 4th 261, 271 (2001); *see also* Cal. Civ. Code §§ 1550(2), 1565. It follows that an offeree cannot accept an offer the offeree does not know exists, and a contracting party cannot unilaterally change the terms of a contract without the other's consent. *Douglas v. U.S. Dist. Court for Cent. Dist. of*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 17-0556-DOC (RAOx)                                   Date: November 8, 2017
                                                                    Page 6

*Cal.*, 495 F.3d 1062, 1066 (9th Cir. 2007). Indeed, "[p]arties to a contract have no obligation to check the terms on a periodic basis to learn whether they have been changed by the other side." *Id.* But giving notice of new terms of service—such as including a link to a website with changed governing terms in a mailed billing statement—can be sufficient notice to bind an offeree-consumer. *Id.* at 1066–67 (construing *Bischoff v. DirecTV, Inc.*, 180 F. Supp. 2d 1097, 1103–06 (C.D. Cal. 2002)); *see also* Cal. Civ. Code § 1589 ("A voluntary acceptance of the benefit of a transaction is equivalent to a consent to all the obligations arising from it, so far as the facts are known, or ought to be known, to the person accepting.").

In March and May of 2014, Defendants mailed billing statements to both Plaintiffs that noted that there was a new agreement that contained an arbitration clause. Flores Decl. ¶¶ 21–26 & Exs. C–F; Foust-Skudler Decl. ¶¶ 3–4. The documents stated that Plaintiffs could opt out of the arbitration provision, and provided a link to the full text of the relevant agreement. *See* Flores Decl. ¶¶ 21–26 & Exs. C–F. These notices were conspicuously featured in the substantive portion of the billing statements, on the page that containwd the charges and payment due date, with the same font size as the substantive billing line items. *See* Flores Decl. Ex. C, at 35; *id.* Ex. D, at 41; *id.* Ex. E, at 43; *id.* Ex. F, at 45. In the May 2014 billing statements, this notice was prefaced in all caps: "NEW TWC SUBSCRIBER AGREEMENT." *Id.* Ex. E, at 43; *id.* Ex. F, at 45. Defendants claim that because Plaintiffs received clear notice of the new agreement and continued to accept TWC's services, the 2014 RSSA binds Plaintiffs. Mot. at 5–6.

In response, Plaintiffs argue that the billing statement disclosures were not reasonably conspicuous and thus did not provide inquiry notice sufficient to bind Plaintiffs to the 2014 RSSA. Opp'n at 15. However, in the March 2017 billing statements sent to Plaintiffs, Defendants included notices of another new subscriber agreement which were just as prominently displayed as the notices in the 2014 statements and did not even include the link to the full terms of the agreement, and yet, the 2017 statements put Plaintiffs on notice. *Compare* Roberson Decl. Ex. A, at 7 ("The terms and conditions applicable to your services contain a binding arbitration provision . . . ."), *and* Hart Decl. Ex. B, at 17 (same), *with* Flores Decl. Ex. C, at 35 ("You have a new TWC subscriber agreement, which contains an arbitration clause . . . ."), *and id.* Ex. D, at 41 (same). These 2017 notices spurred Plaintiffs to find the then-operative RSSA and try to opt out of that arbitration provision. *See* Roberson Decl. ¶ 6 ("I learned of this 'reminder' and figured out what 'terms and conditions' Spectrum was referring to . . . ."); Hart Decl. ¶ 6 (same). Consequently, Plaintiffs' own declarations defeat their challenge that the notice of the 2014 RSSA was not "[r]easonably conspicuous." *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 35 (2d Cir. 2002) (construing California law); *cf. Meyer v. Kalanick,*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 17-0556-DOC (RAOx)                    Date: November 8, 2017
                                                     Page 7

200 F. Supp. 3d 408, 418 (S.D.N.Y. 2016) (denying that a contract was formed under
California law because the terms of service were too obscure, noting that "the phrase
'Terms of Service & Privacy Policy' is much smaller and more obscure, both in absolute
terms and relative to the 'Register' button."), *rev'd sub nom. Meyer v. Uber Techs., Inc.*,
868 F.3d 66, 78 (2d Cir. 2017) ("[T]he design of the screen and language used render the
notice provided reasonable as a matter of California law. . . . Although the sentence is in
a small font, the dark print contrasts with the bright white background . . . .").

        Moreover, the importance of a billing statement—it contains information at the
heart of the service relationship—may make it well-suited for use a means to
communicate important information such as contract terms. In fact, a periodic billing
statement is a document with the purpose of notifying consumers of important matters
governing a service relationship, including changes from period to period in the payment
amount and due date. *Compare* Flores Decl. Ex. C, at 35 ($140.15 due March 27, 2014),
*with id.* Ex. E, at 43 ($155.00 due May 27, 2014). Thus, it may be an appropriate location
for a change of service notification. *See James v. Comcast Corp.*, No. 16-cv-02218-EMC,
2016 WL 4269898, at *2 (N.D. Cal. Aug. 15, 2016) (finding that, when a
telecommunications service provider included a new arbitration provision in a billing
statement, a consumer who continued to use the services accepted the provision); *cf.
Ackerberg v. Citicorp USA, Inc.*, 898 F. Supp. 2d 1172, 1176 (N.D. Cal. 2012)
("Numerous courts have found that continued use or failure to opt out of a card account
after the issuer provides a change in terms, including an arbitration agreement, evidences
the cardholder's acceptance of those terms.").

        Thus, if Plaintiffs received the 2014 billing statements, they would have been on
notice of the terms of the 2014 RSSA; their continued acceptance of Defendants' services
would thus bind them to those RSSA terms. Plaintiff Hart does not dispute that she
received the billing statements containing these notices. *See* Hart Decl. at ¶ 6 ("[T]hey are
the same or similar to the monthly billing statements I usually received from TWC."). On
the other hand, Plaintiff Roberson protests that because he signed up for paperless billing,
he did not receive such billing statements, and he denies receiving the March and May
2014 statements. Roberson Decl. ¶¶ 4–5. However, Defendants offer evidence that those
statements were mailed to Roberson because he had missed payments. Foust-Skudler
Decl. ¶¶ 3–4, 10–11. Roberson does not dispute missing some payments. *See* Roberson
Decl. ¶ 4. Roberson's bare denial is insufficient to show that he never received these
billing statements, especially in light of Defendants' affirmative proof of mailing, which,
under the mailbox rule, triggers the presumption that Roberson did in fact receive the
billing statements. *Schikore v. BankAmerica Supplemental Ret. Plan*, 269 F.3d 956, 963
(9th Cir. 2001) ("[T]he presumption of receipt established by the mailbox rule applied

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 17-0556-DOC (RAOx)                                    Date: November 8, 2017
                                                                                            Page 8

precisely to avoid the type of swearing contest in which the parties are presently involved." (internal quotation marks omitted)); *see, e.g.*, *Castro v. Macy's, Inc.*, No. C 16-5991 CRB, 2017 WL 344978, at *3 (N.D. Cal. Jan. 24, 2017) (applying the common law mailbox rule to defeat a party's denial of receipt of an arbitration agreement by mail); *James*, 2016 WL 4269898, at *2 & n.5 (same); *Hill v. Anheuser-Busch InBev Worldwide, Inc.*, No. CV 14-6289 PSG (VBKx), 2014 WL 10100283, at *3 (C.D. Cal. Nov. 26, 2014) (same).

Plaintiffs received, in their billing statements, written notice by U.S. mail of the 2014 RSSA and its arbitration provision. Thus, the Court finds that there is no factual dispute that the 2014 RSSA binds Plaintiffs. Even assuming that the 2014 RSSA did not bind Plaintiffs until 30 days after they had received notice of the new agreement, neither Plaintiff opted out of the agreement by the time the opt-out period elapsed. *See* Flores Decl. Ex. A at 14, 17; *id.* ¶ 40; Roberson Decl. ¶ 6; Hart Decl. ¶ 6. Failure to opt out after adequate notice of the arbitration provision, coupled with Plaintiffs' continued acceptance of Defendants' services, bound Plaintiffs to the arbitration provision contained in the 2014 RSSA. *See* Cal. Civ. Code § 1589 ("A voluntary acceptance of the benefit of a transaction is equivalent to a consent to all the obligations arising from it, so far as the facts are known, or ought to be known, to the person accepting.").

Thus, the Court finds that the 2014 RSSA is a contract that binds the Plaintiffs. The Court declines to decide the existence or validity of any other contracts or arbitration provisions to which Plaintiffs purportedly agreed, including the 2010 and 2016 RSSAs.[2]

---

[2] As stated above, the Court declines to decide whether the 2016 RSSA binds Plaintiffs. Defendants assume the 2016 RSSA applies to Plaintiffs. *See* Motion at 9–13. They claim that "Spectrum made some minor updates to the [2016] RSSA in respects that are not material to this motion." *Id.* at 3. But the Court is not convinced that Plaintiffs are bound to the arbitration provision in the 2016 RSSA. The language of the 2016 RSSA's arbitration provisions is indeed nearly identical to the 2014 version. *See* Flores Decl. Ex. B, at 20, 27, 30–31. However, the 2016 RSSA substitutes the American Arbitration Association's "Commercial Arbitration Rules" with its "Consumer Arbitration Rules." *Id.* at 30. As stated in the 2014 RSSA, the agreement the 2016 version replaced, TWC was to "provide [subscribers] at least 30 days' notice of any material change to . . . the arbitration provisions contained in Section 15 of this [2014] Agreement and any such change will become effective only after such notice period has run." *Id.* Ex. A, at 14.

Defendants have offered no evidence that it gave notice of this change to the arbitration provision in 2016. *See* Motion at 3; *cf. Douglas*, 495 F.3d at 1066 ("Parties to a contract have no obligation to check the terms on a periodic basis to learn whether they have been changed by the other side."). Though Defendants seem to contend the change is immaterial, *see* Motion at 3, the Court cannot decide based on the limited briefing on this issue that the change in the applicable arbitration rules is indeed immaterial. *See* Flores Decl. Ex. A, at 17 ("To opt out, you must notify TWC . . . within 30 days of the date that you first became subject to this arbitration provision (i.e., . . . if this Section 15 (or a *predecessor version that is not materially different from this Section 15*) was not then a part of the Customer Agreements, then the date that this Section 15 became binding on you . . . ." (emphasis added)). Plaintiffs were apparently first given notice in their March 2017 billing statements of an RSSA purportedly operative beginning in April 2016, and Plaintiffs opted out fewer than 30 days after Defendants gave notice of the changed

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 17-0556-DOC (RAOx)                          Date: November 8, 2017
                                                          Page 9

### B.      Enforceability of the 2014 RSSA

Plaintiffs argue that, if an RSSA binds them, it binds them with respect to TWC, the original party to the pre-2017 RSSAs, and thus Defendants cannot enforce the RSSAs between Plaintiffs and TWC. Opp'n at 9–10. Defendants argue that Plaintiffs have admitted that TWC and Defendants are one and the same and that, by operation of law, Defendant Spectrum Holding has the right to enforce TWC's RSSAs. Reply at 12–15.

First, Plaintiffs' FAC admits that "there is sufficient identity of parties" between TWC and Defendants. *See Valley Casework, Inc. v. Comfort Constr., Inc.*, 76 Cal. App. 4th 1013, 1021 (1999). They allege in the FAC that "TWC merged with and into" Defendants, and that Spectrum is "formerly known as 'Time Warner Cable.'" FAC at 2, ¶ 8. At least part of Plaintiffs' claims against Defendants arise from TWC's pre-merger acts or omissions. *See id.* ¶ 12 ("*For years* and continuing through the present day, Defendants have defrauded and misled consumers" (emphasis added)); *id.* ¶¶ 19, 21 ("[Plaintiffs] signed up for Defendants' Internet services *years ago* when it was still branded as 'Time Warner Cable.'" (emphasis added)). These factual assertions bind Plaintiffs to an admission that Defendants are the successors in interest to TWC. *See Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 470 n.6 (citing *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988)) (binding a party to a concession in its pleadings); *In re Barker*, 839 F.3d 1189, 1195 (9th Cir. 2016) ("Judicial admissions are 'conclusively binding on the party who made them.'" (quoting *Am. Title. Ins. Co.*, 861 F.2d at 226)).

Second, by operation of the law of Delaware, where Defendants are—and TWC was—incorporated, the merger had the effect of endowing Defendant Spectrum Holding with TWC's rights. Because Spectrum Holding is the surviving corporation in the merger, it retains "all property, rights, privileges, powers and franchises, and all and every other interest." 8 Del. C. § 259(a); *see* Bollinger Decl. ¶¶ 4–8 & Exs. A–B. Moreover, "[t]he Ninth Circuit has confirmed that non-signatories may enforce arbitration agreements . . . [w]hen the charges against a parent company and its subsidiary are based on the same facts and are inherently inseparable . . . ." *McLeod v.*

---

arbitration provision. Flores Decl. ¶ 9; Roberson Decl. ¶ 6; Hart Decl. ¶ 6; *see* Motion at 3–4; Flores Decl. Ex. A., at 14; Roberson Decl. ¶ 6 & Exs. A–B; Hart Decl. ¶ 6 & Exs. B–C. Thus, if the change in the applicable arbitration rules was material, Plaintiffs may have opted out of the 2016 RSSA's arbitration provision successfully.

Nonetheless, given the Court's findings with respect to the 2014 RSSA, the Court cannot decide whether the arbitration provision in the 2016 RSSA binds Plaintiffs. That is, even if Plaintiffs' 2017 attempts to opt out of the 2016 and 2017 RSSAs' arbitration provisions were successful, the existence and validity of the 2014 RSSA, which contains an arbitrability delegation clause (discussed below), requires this Court to refrain from deciding the gateway arbitrability issues presented by the purported opt outs.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. SA CV 17-0556-DOC (RAOx)                                    Date: November 8, 2017
                                                                     Page 10

*Ford Motor Co.*, No. EDCV 04-1255-VAP(SGLx), 2005 WL 3763354, at *4 (C.D. Cal. Apr. 14, 2005) (quoting *J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315, 320–21 (4th Cir. 1988)). Thus, given the identity of TWC and Spectrum Holding, claims against Charter, Spectrum Holding's parent company, also may be referred to arbitration. *See, e.g.*, *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1129 (9th Cir. 2013) (noting that a signatory may be equitably estopped from avoiding arbitration "when the signatory alleges substantially interdependent and concerted misconduct by the nonsignatory and another signatory and the allegations of interdependent misconduct [are] founded in or intimately connected with the obligations of the underlying agreement" (quoting *Goldman v. KPMG, LLP*, 173 Cal. App. 4th 209, 219 (2009))).

Because Plaintiffs have admitted the identity of parties and because Spectrum Holding is endowed with TWC's rights by operation of law, Defendants can enforce the 2014 RSSA.

## C.   Delegation of Arbitrability Issues to the Arbitrator

Defendants contend that the parties agreed that questions of arbitrability of claims were clearly and unmistakably delegated to an arbitrator. Mot. at 11–13. In response, Plaintiffs argue that the incorporation of the AAA rules is qualified by a clause allowing the parties to stipulate to an alternative and that the words "claims" and "appropriate" as used in the arbitrability delegation provision are ambiguous. Opp'n at 19–21.

A party seeking to compel arbitration under the FAA has the burden to show that (1) there exists a valid, written agreement to arbitrate in a contract, and (2) the agreement to arbitrate encompasses the dispute at issue. *Cox v. Ocean View Hotel Corp.*, 533 F.3d 1114, 1119 (9th Cir. 2008); *see also* 9 U.S.C. § 2. "Although [these] gateway issues of arbitrability presumptively are reserved for the court, the parties may agree to delegate them to the arbitrator." *Momot*, 652 F.3d at 987. "[W]hether the court or the arbitrator decides arbitrability is an issue for judicial determination unless the parties *clearly and unmistakably provide otherwise*." *Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1208 (9th Cir. 2016) (quotation marks omitted) (quoting *Oracle Am., Inc. v. Myriad Group A.G.*, 724 F.3d 1069, 1072 (9th Cir. 2013)).

In the Ninth Circuit, "incorporation of the AAA rules constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability."[3] *Brennan*

---

[3] Section R-7 of the AAA's Commercial Arbitration Rules provides, "The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or the arbitrability of any claim or counterclaim. . . . The arbitrator shall have the power to

Case No. SA CV 17-0556-DOC (RAOx)                    Date: November 8, 2017

*v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015). "[T]he holding of *Opus Bank* applies . . . to non-sophisticated parties." *McLellan v. Fitbit, Inc.*, No. 3:16-cv-00036-JD, 2017 WL 4551484, at *2 (N.D. Cal. Oct. 11, 2017) (quoting *Miller v. Time Warner Cable Inc.*, No. 8:16-cv-00329-CAS (ASx), 2016 WL 7471302, at *5 (C.D. Cal. Dec. 27, 2016)); *see Zenelaj v. Handybook Inc.*, 82 F. Supp. 3d 968, 973 (N.D. Cal. 2015) (prior to *Opus Bank*, collecting cases that "found effective delegation of arbitrability regardless of the sophistication of the parties"); *cf. Mohamed*, 848 F.3d at 1208–09 (upholding an express delegation of arbitrability without considering the parties' level of sophistication).

       Here, the 2014 RSSA incorporates the AAA's Commercial Arbitration Rules in its arbitration provision. Flores Decl. Ex. A, at 16. Plaintiffs argue that the clause allowing parties to stipulate to a different arbitration institution is a qualification of this agreement to the AAA's rules. Opp'n at 20. However, providing parties the option to stipulate to a different arbitration institution is inapposite to the unequivocal agreement to use the AAA's Commercial Arbitration Rules in the absence of such an agreement. The sentence agreeing to AAA rules is supplemented, not qualified, by the clause allowing the parties to stipulate to an alternative, and the agreement is no less clear for its inclusion. *See* Flores Decl. Ex. A, at 16.

       Moreover, the 2014 RSSA expressly dictates that "claims relating to whether arbitration is appropriate . . . will be decided by an arbitrator, not a court." Flores Decl. Ex. A, at 16. Plaintiffs argue that the words "claims" and "appropriate" as used in this clause are ambiguous. Opp'n at 20.  However, though the wording of the clause is awkward, its unambiguous meaning is not lost, especially when considered in conjunction with the AAA's relegation of jurisdictional authority to the arbitrator. The parties are bound by their explicit agreement to refer questions of "whether arbitration is appropriate" to an arbitrator. *See Miller*, 2016 WL 7471302, at *5 (holding that a similar express agreement delegated arbitrability).

       This order does not preclude Plaintiffs from arguing before the arbitrator that their claims are outside the scope of their agreement to arbitrate. Indeed, some portion of the claims might not be subject to arbitration given Plaintiffs' attempts to opt out of the 2016

---

determine the existence or validity of a contract of which an arbitration clause forms a part." Am. Arbitration Ass'n, *Commercial Arbitration Rules and Mediation Procedures* 13 (2016), https://www.adr.org/sites/default/files/Commercial%20Rules.pdf; *accord* Am. Arbitration Ass'n, *Consumer Arbitration Rules* 17 (2016), https://www.adr.org/sites/default/files/Consumer%20Rules.pdf (same).

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 17-0556-DOC (RAOx)                    Date: November 8, 2017
                                                     Page 12

and 2017 RSSAs in March, June, and July of 2017. Nevertheless, the 2014 RSSA evinces
an agreement to submit issues of arbitrability to an arbitrator.[4]

### D.      Enforceability of the Agreement to Delegate Arbitrability

        Defendants emphasize that Plaintiffs challenge that the arbitration agreement
generally—not the delegation provision specifically—is unenforceable. Opp'n at 21–22.
Defendants charge that Plaintiffs' arguments are inapposite to the issue before this Court,
that is, "whether the particular agreement to *delegate* arbitrability" is unenforceable.
*Opus Bank*, 796 F.3d at 1132–33 (citing *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63,
71–75 (2010)); *see* Reply at 17. In *Opus Bank*, the Ninth Circuit recognized that an
arbitration clause and a delegation provision within the arbitration clause "are separate
agreements to arbitrate different issues" and that in such a scenario, "multiple severable
arbitration agreements exist." *Id.* at 1133.

        Plaintiffs' arguments that the arbitration agreement is unenforceable are properly
left to the arbitrator to decide, per the express agreement of the parties. Because
Plaintiffs' challenges with respect to unconscionability and waiver "failed to 'make any
arguments specific to the delegation provision,'" this Court does not consider them. *Id.* at
1133 (quoting *Rent-A-Center*, 561 U.S. at 74); *see* Opp'n at 21–23; *accord McLellan*,
2017 WL 4551484, at *1 ("Challenges [to the validity of a delegation clause] may be
considered by courts, but challenges [to the validity of the agreement to arbitrate] must
go to the arbitrator pursuant to the delegation clause.").

## IV.      Disposition

        For the foregoing reasons, the Court GRANTS Defendants' Motion.

        As noted above, the arbitrator may determine that Plaintiffs' claims are not subject
to the agreement to arbitrate or that the agreement is unenforceable. Thus, dismissal of
Plaintiffs' claims is inappropriate.

        Accordingly, the case is STAYED pending the completion of arbitration
proceedings, pursuant to 9 U.S.C. § 3. The parties are ORDERED to file a status update

---

[4] This necessarily includes issues of arbitrability relating to Plaintiffs' claims for restitution and declaratory relief.
"[C]laims for injunctive orders or similar relief" are carved out of the 2014 RSSA's arbitration provision. Flores
Decl. Ex. A, at 16. Nevertheless, the arbitrability delegation clause divests the Court of its power to determine
whether those claims are arbitrable. *See Oracle Am.*, 724 F.3d at 1076 ("[W]hen a tribunal decides that a claim falls
within the scope of a carve-out provision, it necessarily decides arbitrability.").

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 17-0556-DOC (RAOx)                    Date: November 8, 2017
                                                                  Page 13

on arbitration proceedings every six months from the date of this order until the conclusion of arbitration in this matter.

      The Clerk shall serve this minute order on the parties.

MINUTES FORM 11                                    Initials of Deputy Clerk: djl
CIVIL-GEN

# EXHIBIT 3



Western Case Management Center
Neil Currie
Vice President
45 E River Park Place West, Suite 308
Fresno, CA 93720
Telephone: (877)528-0880
Fax: (855)433-3046

June 18, 2018

Jamin Soderstrom, Esq.
Soderstrom Law
3 Park Plaza
Suite 100
Irvine, CA 92614
Via Email to: jamin@soderstromlawfirm.com

Daniel S. Schecter, Esq.
Latham & Watkins, LLP
10250 Constellation Boulevard
Suite 1100
Los Angeles, CA 90067
Via Email to: daniel.schecter@lw.com

Case Number: 01-18-0000-5446

Elizabeth Hart
-vs-
Charter Communications, Inc.
and Spectrum Management Holding Co. LLC

Dear Parties:

Per the applicable Rules, the American Arbitration Association (AAA) has administratively appointed William J. Tucker. Arbitrator Tucker accepted the appointment and has agreed to serve on this consumer matter at the established compensation rate for consumer disputes.

In accordance with the California Arbitration Law (CCP §1281.85 et seq.), enclosed please find the duly executed Notice of Appointment, which includes the arbitrator Disclosure Worksheet, the Notice of Compensation Arrangements, and Arbitrator Tucker's resume.

For your review, we have also enclosed the Provider Organization Disclosure which is required under California Code of Civil Procedure Section 1281.9.

Also enclosed is the AAA's Neutrals Data Base Search information as of June 15, 2018, which is provided to you pursuant to California's Ethics Standards for Neutral Arbitrators in Contractual Arbitration Standard 8(b)(1)(A) regarding whether a party, a lawyer in the arbitration, or an attorney of the law firm with which a lawyer in the arbitration is currently associated is a member of the AAA's panel of arbitrators.

Pursuant to Code of Civil Procedure Section 1281.91, any party may serve a notice of disqualification on the basis of the disclosure statement within fifteen (15) calendar days from the date of this letter. Copies of the objection are to be provided to all parties. However, the arbitrator shall not be copied on any correspondence

regarding objections to their service.

If any objections are received, the other party will be given an opportunity to respond before the AAA makes a determination, in accordance with the Rules, regarding the arbitrator's continued service.

Absent our receipt of a notice of disqualification within the time specified, the appointment of William J. Tucker is confirmed, as indicated by the signed Oath of Arbitrator contained in the Notice of Appointment.

As requested by the arbitrator, and specified in the Consumer Arbitration Rules, the parties and their representatives must provide information to the AAA of any circumstances likely to raise justifiable doubt as to whether the arbitrator can remain impartial or independent. Further, such obligation to provide disclosure information remains in effect throughout the arbitration.

Sincerely,
/s/
Heather Pope
Case Administrator
Direct Dial: (559)490-1909
Email: HeatherPope@adr.org
Fax: (855)433-3046

Supervisor Information: *Sophia Parra, Manager of ADR Services, (559) 490-1907,* *SophiaParra@adr.org*

HP/sp
Enclosures
bcc:    William J. Tucker, Esq.
cc:     Christine M. Flores
        Andrew D. Prins, Esq.
        Diana Alderete
        Paul Roy
        Douglas L. Mahaffey, Esq.
        Matthew A. Brill
        Christie Schmieder, Esq.

# EXHIBIT 4

In the Matter of the Arbitration between:

Re: 01-18-0000-5446

    Elizabeth Hart, Claimant

    v.

    Charter Communications, Inc., and Spectrum Management Holding Company, LLC

## **INTERIM AWARD OF ARBITRATOR**

    I, William J. Tucker, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement in and between the above-named parties entered into in January 2014, and having been duly sworn, Claimant Elizabeth Hart ("Hart") having been represented by Jamin A. Soderstrom of Soderstrom Law PC and Douglas L. Mahaffey of Mahaffey Law Group, P.C., and Respondents Charter Communications, Inc., and Spectrum Management Holding Company, LLC (collectively referred to as "Spectrum") having been represented by Daniel S. Schecter, Matthew A. Brill, Andrew D. Prins, Alexander L. Stout and Nicholas L. Schlossman of Latham & Watkins, LLP, Hart and Spectrum having fully briefed their respective dispositive motions addressing all six of Hart's claims in her Amended Arbitration Demand and all three of Spectrum's counterclaims, and I having reviewed the opening and responding briefs of both parties on all of those claims, do hereby render this INTERIM AWARD OF ARBITRATOR, as follows:

## **BACKGROUND FACTS**

    In 2017, Hart and another individual named Le'Roy Roberson filed a putative class action in federal district court in the Central District of California against

Spectrum. Hart and Roberson asserted that Spectrum had "failed to provide a network and infrastructure capable of supporting all of its subscribers and their promised Internet speeds." Hart and Roberson further asserted that Spectrum had increased charges to consumers, such as Hart and Roberson, without adequate notice. Spectrum filed a motion to compel arbitration based on an arbitration provision in a 2014 Residential Services Subscriber Agreement ("RSSA") as well as subsequent RSSAs.

The arbitration provision provided in pertinent part:

> Only claims for money damages may be submitted to arbitration; claims for injunctive orders or similar relief must be brought in a court (other than claims relating to whether arbitration is appropriate, which will be decided by an arbitrator, not a court). You may not combine a claim that is subject to arbitration under this Agreement with a claim that is not eligible for arbitration under this Agreement. . . .

On November 8, 2017, the District Court issued its ruling compelling arbitration. The Court found that "the 2014 RSSA is a contract that binds the Plaintiffs." The court further ruled that, "The parties are bound by their explicit agreement to refer questions of 'whether arbitration is appropriate' to an arbitrator." Further, said the Court, "This Order does not preclude Plaintiffs from arguing before the arbitrator that their claims are outside the scope of their agreement to arbitrate." Having so ruled, the court stayed the case "pending the completion of arbitration proceedings, pursuant to 9 U.S.C. §3."

## HART'S CLAIMS IN ARBITRATION

Pursuant to the District Court's Order, Hart filed an Arbitration Demand against Spectrum on January 26, 2018, and thereafter filed an Amended Arbitration Demand. In her Amended Arbitration Demand, Hart asserted class-action allegations and pled the following claims: Count One (Fraudulent Inducement); Count Two (Violation of California's False Advertising Law, Bus. & Prof. Code §§17500 et. seq.); Count Three (Common Law Fraud and Misrepresentation); Count Four (Violation of the Electronic Funds Transfer Act (15 U.S.C. §§1693 et. seq.); Count Five (Violation of California's Consumers

Legal Remedies Act, Civ. Code §§1750 et. seq.); and Count Six (Violation of California's Unfair Competition Law, Bus. & Prof. Code §§17200 et. seq.).

In her Amended Arbitration Demand, Hart requested dismissal of the arbitration "based on (1) the fact that the arbitration clause is 'null and void' by its own terms, and, alternatively (2) the inarbitrability of claims for injunctive orders and similar relief."

## SPECTRUM'S COUNTERCLAIMS AGAINST HART

Spectrum filed three counterclaims against Hart in the arbitration. Count One sought declaratory relief, in particular, a declaration that (1) any of Hart's six causes of action are arbitrable to the extent they seek any form of money damages; and (2) Hart's arbitrable claims for money damages are improperly joined with non-arbitrable claims for injunctive relief.

Count Two of Spectrum's Counterclaims seeks a declaration that Hart breached her agreement by filing her Amended Demand for Arbitration on behalf of a putative class. It also seeks money damages.

Count Three of Spectrum's counterclaims seeks a finding that Hart breached her agreement with Spectrum by (1) asserting class action claims; (2) bringing suit alongside an unrelated third-party (Le'Roy Roberson); (3) combining arbitrable claims for money damages with non-arbitrable claims for injunctive relief; and (4) bringing suit in court when the delegation clause required the threshold question of arbitrability to be submitted to an arbitrator.

## NONE OF HART'S CLAIMS IN HER AMENDED ARBITRATION DEMAND ARE ARBITRABLE

Both parties agree that, to the extent Hart has asserted a claim that does not seek "money damages," that claim is not arbitrable. It is clear that none of the six claims asserted by Hart in her Amended Arbitration Demand are arbitrable.

As an example, in Count One, Hart seeks the following relief:

> Hart, individually and on behalf of all Class members, seeks an
> individual, representative, and public injunctive order,
> providing *inter alia*, injunctions against the above-described
> conduct requiring Respondents to cease and correct all false and

misleading representations concerning Internet speeds and reliability, orders granting rescission of the underlying agreements entered into as a result of Respondents' false and misleading representations, and, orders granting all similar relief available." Amended Arbitration Demand ¶ 40.

Hart seeks the exact same relief in Count Two. The only difference between the wording of the relief sought in these counts is that in Count One, the last phrase seeks "all similar relief available," whereas in Count Two, the last phrase seeks "all similar relief available under the FAL." Amended Arbitration Demand ¶ 46.

Hart seeks the following relief in Count Three:

Hart, individually and on behalf of all Class members, seeks individual, representative, and public injunctive orders requiring Respondents to cease and correct all false and misleading representations concerning Internet speed and reliability, and orders granting all similar relief available. Amended Arbitration Demand ¶ 53.

Hart seeks the following relief in Count Four:

Hart, individually and on behalf of all Class members, seeks individual, representative, and public injunctive orders requiring Respondents to correct their unlawful policies and practices and make clear and conspicuous disclosures of the automatic payment terms and conditions and provide written copies of all relevant terms, and orders granting all similar relief available, including but not limited to costs and reasonable attorneys' fees." Amended Arbitration Demand ¶ 63.

Hart seeks the following relief in Count Five:

Under Sections 1780 and 1781 of the CLRA, Hart, individually and on behalf of all Class members, seeks an individual, representative, and public injunctive orders requiring Respondents to cease and correct all false and misleading

representations concerning Internet speeds and reliability and correct all unconscionable and illegal terms and conditions, and orders granting all similar relief available under the CLRA, including but not limited to costs and reasonable attorneys' fees." Amended Arbitration Demand ¶ 72.

Hart seeks the following relief in Count Six:

Hart, individually and on behalf of all Class members, seeks individual, representative, and public injunctive orders requiring Respondents to cease and correct all false and misleading representations concerning Internet speed and reliability and provide clear and conspicuous disclosures concerning automatic payment terms and policies, and orders granting all similar relief available under the UCL and/or CAPRI. Amended Arbitration Demand ¶ 84.

Conspicuously absent from Hart's Amended Arbitration Demand is any reference to, let alone a request for, "damages." Spectrum asserts that "restitution" is a remedy under at least some of the six claims asserted by Hart in the arbitration, and that the reference to "money damages" in the 2014 RSSA includes restitution, because restitution requires a payment of money by the defendant to the plaintiff. However, the 2014 RSSA specifically provides that, "claims for injunctive orders or similar relief must be brought in a court." The only relief sought by Hart in her Amended Arbitration Demand is "injunctive orders or similar relief."

Spectrum asserts that Hart has engaged in artful pleading, apparently noting that Hart has chosen to use in the six claims asserted in her Amended Arbitration Demand the very same wording of the arbitration provision in the 2014 RSSA ("injunctive orders or similar relief"). It does appear that Hart has consciously done exactly that. The response, of course, is that Hart has every right to craft the wording of the relief she seeks in such a way to avoid a ruling that any of her claims are arbitrable. It is clear that whatever "money damages" encompass within the meaning of the arbitration provision, they are not "injunctive orders or similar relief." Spectrum has made that clear. It is also clear that Spectrum cannot force Hart to seek "money damages" if she does not want to do so.

## SPECTRUM'S FIRST COUNTERCLAIM IS MOOT

Based on the above, I find that none of the six claims asserted by Hart in her Amended Arbitration Demand are arbitrable. Consequently, Spectrum's request for a declaration that, if any such claims seek damages, they are arbitrable and that Hart has breached the 2014 RSSA by combining arbitrable with non-arbitrable claims, is moot.

## SPECTRUM'S SECOND COUNTERCLAIM IS ARBITRABLE

Spectrum's Second Counterclaim is arbitrable, because it seeks "money damages" for breach of contract, specifically breach of the agreement that Hart would not file a putative class action. The fact that Respondent has joined a claim for declaratory relief with its claim for money damages may or may not be a defense to this breach of contract claim, but that may not be determined at this time by way of summary adjudication.

## SPECTRUM'S THIRD COUNTERCLAIM IS ARBITRABLE

Spectrum's Third Counterclaim is arbitrable, because it seeks "money damages" for breach of contract. Specifically, Spectrum asserts that Hart breached her agreement with Spectrum that she not (1) assert a class action claim, (2) bring suit alongside an unrelated third-party, (3) combine arbitrable claims for money damages with non-arbitrable claims for injunctive relief, or (4) bring suit in court in light of the delegation clause which required that the threshold question of arbitrability be submitted to an arbitrator.[1]

However, this claim may not be determined at this time by way of summary adjudication, but must be adjudicated in the ordinary course pursuant to the applicable rules of the American Arbitration Association.

---

[1] Although Hart has not combined arbitrable claims for money damages with non-arbitrable claims for injunctive relief in her Amended Arbitration Demand, she appears to have done so in the Complaint she filed in District Court. I view Spectrum's breach of contract counterclaims as asserting that Hart breached the 2014 RSSA (and perhaps subsequent RSSAs) by her filing in District Court, and not her filings in arbitration.

## CONCLUSION

None of Heart's six claims asserted in her Amended Arbitration Demand are arbitrable, because none of them seek "money damages."

Spectrum's First Counterclaim is moot, because it is subsumed in my determination that none of Hart's six claims in her Amended Arbitration Demand seek "money damages" and, therefore, none are arbitrable.

Spectrum's Second Counterclaim and its Third Counterclaim are arbitrable, because they seek "money damages."

Spectrum's Second Counterclaim and its Third Counterclaim cannot be determined at this time by way of summary adjudication. Consequently, they will be adjudicated in accordance with the applicable rules and procedures of the American Arbitration Association. Case Administrator Heather Pope will arrange for a telephonic conference call for us to discuss further proceedings in this matter.

This Interim Award shall remain in full force and effect until the arbitrator issues a Final Award.

Dated: December _10_, 2018

William J. Tucker, Arbitrator

# EXHIBIT 5



In the Matter of the Arbitration between:

Re: 01-18-0000-5446

    Elizabeth Hart, Claimant

    v.

    Charter Communications, Inc. and Spectrum Management Holding Co, Inc., Respondent

## FINAL AWARD OF ARBITRATOR

    I, William J. Tucker, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement in and between the above-named parties dated at an unknown time in 2014, and having been duly sworn, Claimant Elizabeth Hart ("Hart"), having been represented by Jamin Soderstrom of Sodertrom Law, and Respondent Charter Communications, Inc. and Spectrum Management Holding Co, Inc. ("Spectrum") having been represented by Daniel S. Schecter, Matthew A. Brill, Andrew D. Prins, Alexander L. Stout and Nicholas L. Schlossman of Latham & Watkins, LLP, and I having duly heard the proofs and allegations of Claimant and Respondent by way of extensive briefing, having issued an INTERIM AWARD on December 10, 2018, which is confirmed, adopted, and incorporated as if fully set forth herein, and having reviewed the moving, opposition and reply briefs of the parties on Hart's anti-SLAPP motion to strike Spectrum's Second and Third Counterclaims, and having reviewed Spectrum's Fourth Counterclaim, do render this FINAL AWARD OF ARBITRATOR, as follows:

## 1. BACKGROUND FACTS

    On March 28, 2017, Hart filed a Complaint against Spectrum in the Southern District of California. Spectrum brought a Motion to Compel Arbitration pursuant to

an arbitration provision in what it claimed were contracts entered into with Hart in 2014, 2016 and 2017. Hart opposed the motion, asserting the arbitration provisions were unenforceable. On November 8, 2017, The District Court Judge granted the motion and ordered the parties to arbitration. The Judge ruled that the question of arbitrability was one for determination by the Arbitrator, not the Court.

In response to the Court's order compelling arbitration, on January 25, 2018, Hart filed an arbitration demand with the American Arbitration Association. Subsequently, on March 22, 2018, Hart filed her Amended Arbitration Demand.

In her Amended Arbitration Demand, Hart asserted six causes of action. In each cause of action, Hart sought only "injunctive" and "all similar relief." In none of the six causes of action did Hart seek money damages. In her Prayer, Hart sought dismissal of the arbitration she had filed on the grounds she was not seeking "damages" in any of her claims.

Claimant based her request for dismissal on the arbitration provision(s) in the document(s) Spectrum contended were contracts between the parties. Those arbitration provisions provided that all claims for damages must be arbitrated, and that injunctive and all other equitable relief must be sought only in court.

Spectrum opposed Hart's request for dismissal of the arbitration on multiple grounds. One such ground was that the "similar relief" Hart sought included "restitution" and "restitutionary disgorgement." Spectrum argued that, since restitution would require a payment of money by Spectrum to Hart and the putative class members Hart sought to represent, her claims in arbitration did in fact seek damages.

Both parties requested permission to file "dispositive motions," and I granted that request. The parties briefed the issues and, on December 10, 2018, I issued an Interim Award. In that Award I ruled that none of Hart's cause of action sought money damages and, therefore, none of them were arbitrable.

Prior to the filing of the parties' dispositive motions, Spectrum requested permission to file three counterclaims against Hart, and I granted that request. Hart opposed those three counterclaims, and the viability of those counterclaims was also made the subject of the parties' dispositive motions. In my Interim Award, I ruled that Spectrum's First Counterclaim for declaratory relief was moot, and that the

Second and Third Counterclaims, although arbitrable -- because they sought money damages -- could not be resolved in summary fashion and, instead, would need to be arbitrated in the ordinary course.

Thereafter, on January 8, 2019, a telephonic conference with counsel for the parties was held. The purpose was to determine how to proceed with the arbitration of Spectrum's Second and Third Counterclaims. During that telephonic conference, Hart sought permission to serve and file an anti-SLAPP motion to strike Spectrum's Second and Third Counterclaims. I granted that motion and set a briefing schedule. I have now reviewed the moving, opposition and reply briefs on that motion, and the declarations, exhibits and case authorities accompanying those briefs.

Subsequent to this January 8, 2019 telephonic conference, Spectrum requested permission to file a Fourth Counterclaim, and I granted that request. Spectrum served and filed it, and Hart filed her answer denying the Fourth Counterclaim.

## 2. THE ANTI—SLAPP LEGISLATIVE SCHEME DOES NOT APPLY IN ARBITRATIONS

The California Legislature's intent in enacting the anti-SLAPP statute was to provide a mechanism for judges to dispose of cases at an early stage of the litigation, if the claims infringed on the defendant's rights of freedom of speech or to petition for redress of grievances, unless the defendant could prove he was likely to prevail on the merits. Spectrum contends that the Legislature did not intend to apply the same regime to private nonjudicial arbitrations.

Hart disagrees. She contends that arbitrators act like judges, and apply the same legal principles as do courts in resolving disputes. Hart contends that arbitrators base their decisions on the same laws as do judges. Thus, she asserts, an arbitrator may strike a cause of action under California's anti-SLAPP statute.

In Sheppard v. Lightpost Museum Fund, 146 Cal. App. 4th 315, 323, the Court addressed the issue, stating:

> Section 425.16 [of the Code of Civil Procedure, the anti-SLAPP statute] does not "expressly provide" that it applies to claims asserted only in nonjudicial arbitration proceedings. This statute was expressly intended to prevent abuse of the "judicial process," and its terms are not reconcilable with a legislative

intent to extend it to arbitration claims filed only in private nonjudicial forums. It follows that the Legislature did not authorize superior courts to strike arbitration claims filed only in arbitral forums under section 425.16.

Hart contends that the <u>Sheppard</u> decision should not be read to preclude her from prosecuting an anti-SLAPP motion in this arbitration. She contends that the reason the Court of Appeal overruled the trial court's granting of the motion to strike was that the pleading the moving party sought to have stricken was filed in an arbitration proceeding, not before the court. In other words, there was nothing before the court to strike.

Hart contends in her Opposition brief:

> The <u>Sheppard</u> court agreed with the prevailing parties' argument that the proper procedure was what Hart has done here: file the anti-SLAPP motion in arbitration. "If Shepherd wants to pursue a motion to strike, he should be required to do so in the CDRP [arbitration] forum. <u>Sheppard</u> at 319-20."

However, the statement, "If Sheppard wants to pursue a motion to strike, he should be required to do so in the CDRP forum," was not the court's statement. Rather, it was the argument asserted by the party opposing the motion to strike. Consequently, it does not stand for the proposition Hart asserts.

The court in <u>Sheppard</u> provided its reasoning for ruling that and anti-SLAPP motion may not be made in arbitration proceedings. The court pointed out that the anti-SLAPP legislation makes a "cause of action" in a "complaint," subject to a motion to strike. The court noted that, "Complaint, cross-complaints and petitions are pleadings, which are filed in courts to initiate judicial proceedings." 146 Cal. App.4th at 323. By contrast, said the court, "[A]rbitration claims filed only in arbitral forums . . . are very different [from pleadings] because they are not filed in <u>courts</u> and they do not initiate <u>judicial</u> proceedings." (Emphasis in original).

The Court in <u>Sheppard</u> also noted that, "the Legislature expressly stated its intent that section 425.16 target 'abuse of the judicial process,'" and [p]rivate arbitration proceedings are not part of the judicial process; they are 'nonjudicial' proceedings." 146 Cal. App. 4th at 323. Thus, the court concluded that the anti-

SLAPP statute's "terms are not reconcilable with the legislative intent to extend it to arbitration claims filed only in private nonjudicial forums." Id.

Other case authorities are to the same effect. For instance, in Garretson v. Post (2007) 156 Cal. App. 4th 1512, the defendant initiated nonjudicial foreclosure proceedings. The plaintiff paid the amount defendant demanded in order to avoid foreclosure, and then brought an action in court asserting several causes of action, including a claim of wrongful foreclosure. In response, defendant filed an anti-SLAPP motion to strike. The trial court granted the motion. The Court of Appeal reversed, ruling that such a motion was not available in "nonjudicial" proceedings.

Similarly, in Century 21 Chamberlain & Associates v. Haberman (2009), the Court of Appeal affirmed an order denying an anti-SLAPP motion, ruling:

> Resolving an issue of first impression, we hold the anti-SLAPP statute does not protect the act of initiating private, contractual arbitration. The anti-SLAPP statute protects statements made in, or concerning issues under review by, a "judicial proceeding, or any other official proceeding authorized by law." (§4 to 5.16, subd. (e)(1), (2). Private, contractual arbitration is neither. It is a private alternative to a judicial proceeding. It is not an "official proceeding" because it is a nongovernmental activity not reviewable by administrative mandate or required by statute.

The only authority cited by Hart in support of her position is Hotels Nevada, LLC v. L.A. Pacific Center, Inc. (2012) 203 Cal. App. 336. However, in that case, an anti-SLAPP motion was permitted in an arbitration proceeding because the parties expressly stipulated that it could be heard in the arbitration. Although Hart claims that the parties similarly so stipulated in this case, she is incorrect. Spectrum did not so stipulate. Rather, I simply granted Hart's request to file that motion, unaware at the time that such motions may only be made in a judicial proceeding.

For the above reasons, I find that anti-SLAPP motions are impermissible in private nonjudicial arbitrations, and I deny Heart's anti-SLAPP motion.

### 3. THE ATTORNEY'S FEES SPECTRUM REQUESTS IN ITS THIRD COUNTERCLAIM ARE NOT "DAMAGES" PROXIMATELY RESULTING FROM HART'S ALLEGED BREACH OF CONTRACT

Filing a lawsuit and making statements and arguments in court are examples of the exercise of one's free speech and right to petition the court for redress of grievances. Code Civ. Proc. §4 to 5.16 (e) (1); Navellier v. Sletten (2002) 29 Cal. 4th 82, 90 (The right of petition encompasses "the basic act of filing litigation"); Briggs v. Eden Council for Hope & Opportunity (1999) 19 Cal. 4th 1106, 1115. See also Moss Bros. Toy, Inc. v. Ruiz (2018) 27 Cal. App. 5th 424, in which the court held that filing a putative class action and opposing a motion to compel arbitration were protected petitioning activities. Id. at 434.

In Moss, plaintiff employee filed a putative class action in court, and opposed the defendant employer's motion to compel arbitration. In response, the employer brought a claim for breach of contract and sought damages consisting of "legal costs, attorney fees, and time spent" that the company allegedly would not have incurred if the employee had submitted his individual employment-related claims in arbitration, as a 2010 agreement between the parties required. The court ruled that the employer's claim was based on the employee's protected right of petition, and not the breach of the 2010 arbitration agreement.

This case presents the same situation. Hart filed a putative class action lawsuit in court and opposed Spectrum's motion to compel arbitration. Those filings are the bases for spectrum's Third Counterclaim. In that counterclaim, Spectrum asserts that Hart breached her contract with Spectrum by filing the lawsuit in District Court, and in that lawsuit, joining her claims with that of another plaintiff, and opposing Spectrum's motion to compel arbitration, all in breach of Spectrum's contract with her.

Since Hart has an absolute constitutional right to petition the court in filing her lawsuit in court and opposing Spectrum's claimed right to arbitrate her claims, Hart cannot be said to have breached a contract with Spectrum. Were it otherwise, it would render Hart's right to petition nugatory. The fact that Hart does not have a right to have the Third Counterclaim stricken under the anti-SLAPP statute does not affect in any way her constitutional right to petition the court for redress of grievances. Since Hart had a right to file the lawsuit and assert that the arbitration provision was null and

void, Spectrum's attorney's fees in litigating these issues with Hart cannot be considered damages proximately resulting from Hart's alleged breach of contract.

A second, independent reason Spectrum is not entitled to recover its attorney's fees as "damages" is that there is no contract between Spectrum and Hart that provides for an award of attorney's fees to the prevailing party, nor is there any statute that provides for an award of attorney's fees. Under the American rule, absent a statute providing for attorney's fees, or an attorney's fees provision in a contract between the parties, each party must bear its own attorney's fees.

Spectrum contends that the attorney's fees it incurred are the direct result of Hart's breach of her agreement with Spectrum. Assuming Hart breached her contract with Spectrum, despite the fact that her actions were constitutionally protected, Spectrum's position is no different from that of any plaintiff suing a defendant for breach of contract. See, e. g., Olson v. Arnett (1980) 113 Cal. App. 3d 59; Navellier v. Sletten, 106 Cal. App. 4th 763.

In Navellier, Plaintiff sought to enforce a settlement agreement, which included a release. The defendant filed a counterclaim, asserting that the release was null and void. Plaintiff incurred attorney's fees in defending itself against defendant's counterclaims. Plaintiff claimed that defendant had breached its contract with Plaintiff by filing those counterclaims, and asserting the invalidity of the settlement agreement, and sought an award of attorney's fees as his "damages." The Court of Appeal rejected this argument, ruling:

> Plaintiffs' major item of damages, the attorney's fees incurred in connection with the defendant's counterclaims, is not available as a matter of law because neither a statute nor the release provides for recovery of attorney's fees in this case.

The court in Navellier then discussed the similar situation presented in Olson v. Arnett, supra, in which that court similarly ruled, stating:

> Respondents contend that when appellant repudiated the settlement, respondents were forced to continue to employ attorneys and that therefore their attorney fees logically flow as damages from the breach. (Citations omitted). However, to allow respondents to recover their attorney's fees would be

contrary to the well-established [American] rule that in the absence of a special statute or a contractual provision for attorney's fees, the prevailing party is not entitled to recover attorney's fees from his opponent. (Citations omitted).

The instant case is based on a contract, the agreement to settle the underlying action. There is no contention or evidence that there was any provision in the contract for attorney's fees. Appellant breached his contract, and respondents had to employ attorneys in order to enforce that contract. We think this case is not basically different from any other contract action where the nonbreaching party is forced to employ an attorney to enforce the contract but is not entitled to his attorney's fees as damages. 113 Cal. App. 3d at 67-68.

The court in <u>Navellier</u> further noted that, when parties enter into a contract, they are aware of the potential legal costs if one of the parties breaches the agreement. The court noted that it is not unfair to require each party to pay its own legal costs in the event of a breach of contract, if the parties did not find it necessary to include a fee shifting provision when they entered into the agreement.[1]

## 4. THE ATTORNEY'S FEES SPECTRUM REQUESTS IN ITS SECOND COUNTERCLAIM ARE NOT "DAMAGES" PROXIMATELY RESULTING FROM HART'S ALLEGED BREACH OF CONTRACT

Spectrum's Second Counterclaim is different from its Third Counterclaim. In its Third Counterclaim, Spectrum asserted Hart breached the contract by filing a lawsuit in District Court. In the Second Counterclaim, Spectrum asserts that Hart has breached her agreement by filing her Amended Arbitration Demand, in which she sought relief not only on her own behalf, but also on behalf of all putative class members, in contravention of her agreement with Spectrum. However, for the reasons discussed above, the attorney's fees it seeks as damages are not true damages. Since there is no attorney's fees provision in any contract between Spectrum and Hart, and because there is no statute which provides for an award of attorney's fees to the prevailing party in a dispute such as this, Spectrum must bear its own attorney's fees. Consequently, it has no damages.

---

[1] Although Spectrum has cited cases to the contrary, I find that those cases were incorrectly decided.

8

Even if the attorney's fees Spectrum has incurred could constitute true damages, Spectrum has not incurred any attorney's fees as a result of Hart's filing an Amended Arbitration Demand on behalf of the putative class, as well as in her own individual capacity. Claimant sought dismissal of all of her claims filed in the arbitration, and that included claims on behalf of the putative class. Spectrum opposed Hart's "dispositive motion" seeking a determination that none of her claims -- including her claim on behalf of the putative class -- were arbitrable. Spectrum would have filed the same Opposition to Hart's "dispositive motion" had all of Hart's claims in her Amended Arbitration Demand been asserted solely on her own behalf. Moreover, the basis for my ruling that none of Hart's claims were arbitrable was the fact that she sought only "injunctive" and "all similar relief," and not because she had purported to bring those claims on behalf of the putative class, as well as in her own individual capacity.[2]

## 5. **SPECTRUM'S FOURTH COUNTERCLAIM IS MERITLESS**

Spectrum's Fourth Counterclaim asserts that Hart seeks "restitution" and "restitutionary disgorgement," and that such relief constitutes "damages." Consequently, in its Fourth Counterclaim, Spectrum seeks a declaration that Hart must seek such "damages" in this arbitration, and not in court.

In my December 10, 2018 Interim Award, I noted that each of Hart's six causes of action sought only "injunctive" and "all similar relief." Further, that all such relief must be sought in court, and not in this arbitration. Consequently, I am in this Final Award dismissing all of Hart's claims.

Since I am dismissing all of Hart's claims in this arbitration (as well as all of Spectrum's counterclaims), this Final Award will end the entire dispute between the parties in this arbitration, leaving them to whatever claims they may have in the District Court action.

Presumably, Hart will seek "restitution" and "restitutionary disgorgement" in the still-pending District Court action. Should the District Court consider and rule substantively on Hart's causes of action, ruling that the relief she seeks does not constitute "damages," my ruling dismissing spectrum's Fourth Counterclaim will have been shown to be correct.

---

[2] See Moss Bros. Toy, Inc. v. Ruiz (2018) 27 Cal. App. 5th 424, 434, in which the court ruled that attorney's fees incurred by a party in a case in which the opposing party allegedly breached an agreement to not file a class action, did not constitute breach of contract damages.

9

If, on the other hand, the Court rules that "restitution" and "restitutionary disgorgement" are in fact "damages," Hart will be precluded from seeking such damages in this arbitration, because this Final Award will end the arbitration. That result would be eminently fair to Hart, since she has taken the position that all the relief she has sought in the arbitration is "injunctive" and "all similar relief," which she further contends may be awarded only in court. I am simply taking Hart at her word.[3]

## 6. AWARD

Based on the above, and on my December 10, 2018 Interim award, I issue this Final Award as follows:

(1) Hart's anti-SLAPP motion to strike is denied.

(2) All of Hart's causes of action asserted in this arbitration are dismissed.

(3) All of Spectrum's counterclaims filed in this arbitration are dismissed.

(4) There is no prevailing party in this arbitration.

(5) Neither party is entitled to an award of attorney's fees against the other.

The administrative fees of the American Arbitration Association ("the Association") totaling $2,250, and the compensation and expenses of the arbitrator totaling $4,125 shall be borne as incurred by the parties.

This Award is in full settlement of all claims submitted to this Arbitration. All claims not expressly granted herein are hereby denied.

Dated: March 29, 2019

_William J. Tucker_
William J. Tucker, Arbitrator

---

[3] I am unclear whether the litigation privilege asserted by Hart and/or Hart's claim that Spectrum elected the equitable remedy of specific performance, thereby precluding an award of damages, apply. However, based on the above, whether or not either or both would apply would not change the result.

10